BARRY ROSEN
136 S. Clark Dr. #5
Los Angeles, CA 90048
Tel: (323) 653-2043

In Pro Per



# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRY ROSEN, Individually and as a Private Attorney General<br><br>       Petitioner and Plaintiff,<br><br>       vs.<br><br>UNITED STATES GOVERNMENT, FEDERAL AVIATION ADMINISTRATION, AND CITY OF SANTA MONICA,<br>       Respondents and Defendants. | **Case No. 17-CV-07727-PSG-JEMx**<br><br>**(VERIFIED) FIRST AMENDED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF ADMINSTRATIVE PROCEDURE ACT (APA), NATIONAL ENVIROMENTAL POLICY ACT (NEPA), CALIFORNIA ENVIROMENTAL QUALITY ACT (CEQA), CALIFORNIA STATE AERONAUTICS ACT, ET AL.** |

    This action seeks in part to invalidate the 2017 Settlement Agreement/ Consent Decree ("Consent Decree") by and between the Federal Aviation Administration and City of Santa Monica related to Santa Monica Airport as invalid *ab initio*, due to the fact that the City improperly hired outside attorney's in

violation of its own City Charter and related Municipal Code and then improperly filed the lawsuit (13-CV-08046-JFW-VBKx) against the wrong federal agency in the first instance and also because the Federal Aviation Administration fully lacked any authority to grant the actual quite title relief requested in that lawsuit in the second instance and thereby both overstepped its authority and/or violated the Administrative Procedure Act (APA) in entering into the Consent Decree. The correct party for the actual relief sought by the City would be the successor to War Assets Administration, namely the United States General Services Administration ("GSA") with whom the City of Santa Monica actually had a contract (1948 Instrument of Transfer). Moreover, even the GSA lacked the authority to fully release the airport as such relief could only be granted by an act of congress, as there is no provision in the US Code for the fully release of airport lands subject to the contract pursuant to the previous act of congress (War Surplus Act). Plaintiff also seeks to invalidate the previous improper release of lands at Santa Monica Airport by the Federal Aviation Administration pursuant a 1984 agreement with the City of Santa Monica due to the fact that the fact that Federal Aviation Administration lacked and/or otherwise overstepped its authority in releasing said lands in part because it is not the successor to the Administrator/Agency listed in the contract (1948 Instrument of Transfer).

Even if this Court should happen to find that the City of Santa Monica's lawsuit was proper and that the Federal Aviation Administration had authority to approve the relief requested (which it did not have), the Federal Aviation Administration's actions were still illegal and in violation of the Administrative Procedure Act and the National Environmental Protection Act, as they acted arbitrarily, capriciously, contrary to law, abused their discretion, and failed to follow the required procedures, including but not limited to failing to consider the

full effects of their actions and the rights of all interested and/or affected parties, along with obtaining commentaries for those affected parties and the public in general. Such parties include the United States Department of Defense and other US Agencies that have certain rights under 1948 Instrument of Transfer, along with other parties that have rights over Santa Monica Airport such as State of California that has eminent domain under the California State Aeronautics Act (California Public Utilities Code § 21001 et seq.), the Plaintiff's in the Part 16 actions that were pending against the City of Santa Monica related to various violations of various Federal obligations and finally the general public and users of Santa Monica Airport. Moreover, the Federal Aviation Administration can neither exempt itself, nor the City of Santa Monica from obligations under the National Environmental Protection Act and required environmental impact studies thereunder. The Federal Aviation Administration therefore could not grant the right to the allow the City of Santa Monica to almost immediately shorten the runway without having first required Environmental Studies pursuant to NEPA. Moreover, under the consent decree, the City of Santa Monica is fully responsible for complying with its state and federal environmental requirements related to its planning and implementation of modifications at SMO, include the cost of conducting any necessary environmental studies or other requirements under NEPA. Plaintiff is aware that Santa Monica has not abided by such obligations, nor has Federal Aviation Administration enforced those obligations.

Plaintiff is aware that the Federal Aviation Administration has fully failed to ensure that the City of Santa Monica complies with all applicable regulations and obligations governing the operation and use Santa Monica Airport, as it has fully failed to do so. As such Plaintiff now seeks a Writ of Mandate on the Federal Aviation Administration to ensure that the City of Santa Monica complies with the

regulations and obligations that fall within the authority of the Federal Aviation Administration.

Lastly, even if the Court should find Federal Aviation Administration did not violate either the APA or NEPA, the City of Santa Monica has not met its obligations to comply with all State and local regulations pursuant to the requirements of the consent decree and the terms of the 1984 Agreement with the Federal Aviation Administration, including but not limited to violation of the California State Aeronautics Act and California Environmental Quality Act [CEQA] (CA Pub. Res. Code, § 21050 et seq) and finally the regulations of the City of Los Angeles, with whom Santa Monica shares co-jurisdiction over the airport as the eastern portion is located in the City of Los Angeles.

Petitioner and Plaintiff, BARRY ROSEN, alleges against Defendants UNITED STATES GOVERNMENT, FEDERAL AVIATION ADMINISTRATION AND CITY OF SANTA MONICA inclusive as follows:

## PARTIES

### Plaintiff

1. Plaintiff BARRY ROSEN ("Plaintiff") is an individual who currently and at all relevant times has resided within the County of Los Angeles, California. BARRY ROSEN is a licensed pilot, a user of Santa Monica Airport ("SMO") and owner of an aircraft based at SMO. Plaintiff is a both a beneficially interested party and brings this cause of action as a Private Attorney General under the Private Attorney General Doctrine in the public interest for the benefit of other persons similarly affected or situated.

### Defendants

2. Defendant UNITED STATES GOVERNMENT, FEDERAL AVIATION ADMINISTRATION ("FAA") is an agency of the United States government and

bears responsibility, in whole or in part, for the acts complained of in this Complaint.

3.      Defendant CITY OF SANTA MONICA ("CSM") was and now is a municipal corporation organized and existing under the laws of the State of California and claims to be a Charter City, and operates Santa Monica Airport ("SMO").

## JURISDICTION AND VENUE

4.      Plaintiff incorporates by reference each allegation contained in the foregoing paragraphs of this Complaint and all Exhibits as if fully set forth herein.

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to Plaintiffs), 5 U.S.C. §§ 701-706 (Administrative Procedure Act) and 28 U.S.C. § 1367 (Supplemental jurisdiction over additional claims substantially related to the original claim).

6.      An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is the judicial district in which both Plaintiff and Defendant City of Santa Monica resides and this action seeks relief against a Federal Agency and/or because a substantial part of the events giving rise to the claims have occurred in this district due to decisions and actions by Defendants.

## FACTUAL ALLEGATIONS

8.      Plaintiff incorporates by reference each allegation contained in the foregoing paragraphs of this Complaint and all Exhibits as if fully set forth herein.

9.     Plaintiff, Barry Rosen, is a Pilot and user of Santa Monica Airport ("SMO"), and regularly performs Aircraft operations into and out of Santa Monica Airport ("SMO"), including those with his own Aircraft, which is based there. Plaintiff is therefor an affected party and is beneficially interested.

10.     Plaintiff also brings this Action in the public interest as a Private Attorney General due to there being hundreds if not thousands of persons that are similarly affected or situated.

11.     SMO is one of the oldest and busiest single-runway general aviation airports in the country.  Over 80,000 aircraft operations occur at the Airport annually.

12.     The City of Santa Monica lacks full sovereign jurisdiction of SMO as the eastern most portion of SMO is located within the City of Los Angeles and is fully subject to the jurisdiction of the City of Los Angeles. True and correct copies of the City of Los Angeles Zoning Map and City of Santa Monica Zoning maps are attached hereto as Exhibits 1 & 2.

13.     The City of Santa Monica leased SMO to the federal government during World War II, during which the Federal Government purchased additional land and thereby enlarged and reconfigured the SMO into its current runway and taxiway configuration. In 1948, the Federal Government transferred Airport land, buildings, structures, improvements and equipment to the City for public airport purposes via a Surplus Property Act Instrument of Transfer, a true and correct copy of which – together with the City's Resolution 183 adopting it – is attached hereto as Exhibit 3. That 1948 Instrument of Transfer demonstrates that the contract was with the War Assets Administration (the successor of which is the General Services Administration), as well as the burdens and covenants running with the land, binding the City and "its successor and assigns forever," requiring the Airport to be used for 'air park,' civil aviation, and airport purposes forever.

14.     That 1948 Instrument of Transfer demonstrates that the United States of America (Federal Government) has certain rights to utilize SMO and that in the event of a national emergency can take exclusive possession of the SMO (see 1948 Instrument of Transfer paragraphs 2 and 3). It also gave the right to the War Assets Administration or successor thereto to take possession of the Airport should the City of Santa Monica fail to perform its obligations thereunder.

15.     That 1948 Instrument of Transfer also demonstrates that portions of the property may have restrictions released for non-aviation purposes only if those purposes do not materially affect operation or maintenance of the Airport at which such property is located and that in order to effect such release, a payment shall be made to the War Assets Administration or successor thereto for the removal of such restrictions.

16.     In 1984, the City of Santa Monica and FAA entered into an agreement (for reasons that are not fully apparent) that amongst other things, released land restrictions on portions of Santa Monica Airport for non-aviation purposes. Although the agreement expired in July of 2015, the remnants of said agreement remain, including the fact that CSM recently removed numerous acres of land from Aviation usage. A true and correct copy of the 1984 Agreement is attached hereto as Exhibit 4.

17.     That 1984 Agreement demonstrates that no consideration was ever given to the fact that a payment shall made to the War Assets Administration or successor thereto for the removal of such land use restrictions (see paragraph 6).

18.     That 1984 Agreement also demonstrates that the City of Santa Monica had perform certain obligations under the agreement, including the development and implementation of an Airport Layout Plan (aka Airport Land Use Plan) and that CSM must be in conformity with State and local planning law (see sections 5 & 6).

Such conformity would include environmental studies under the California Environmental Quality Act, approval of the Airport Land Use Plan by the Los Angeles County Airport Land Use Commission ("ALUC") (Public Utilities Act § 21675.1), and all appropriate approvals by the City of Los Angeles (and its City Council) pursuant to the Los Angeles City Charter and Municipal code.

19.     In October 2013, the City of Santa Monica brought an action against the United States Federal Aviation Administration in City of Santa Monica v. United States Government Federal Aviation Administration, et al., Case No. CV 13-8046-JFW (VBKx) (C.D. Cal.) ("District Court Action"). This lawsuit alleged five causes of action for: Quiet Title; Violations of the Fifth Amendment under theories of Taking, Regulatory Taking, and due process; and Violation of the Tenth Amendment. The prayer for relief demanded: Declaratory judgments regarding the title to the Airport Property and the City's contentions regarding violations of the United States Constitution; that the court "enjoin the United States from taking any action affecting Santa Monica's right, title, or interest in the Airport Property … from demanding or asserting in any forum that Santa Monica must operate the Airport Property as an airport in perpetuity"; and that the court "order that the United States shall cease and desist from taking any action to require Santa Monica to operate the Airport Property as an airport after the 1984 Agreement expires in July of 2015."

20.     In bringing the 2013 Action, the City Attorney improperly hired an outside law firm (Morrison & Foerster) to bring the lawsuit in violation of both § 608 of the City Charter and § 2.24.073 of the Municipal Code.

21.     In January 2017, the City of Santa Monica and FAA entered into a Settlement Agreement/Consent Decree to settle Case No. CV 13-8046-JFW (VBKx) (C.D. Cal.). As part of that agreement, the FAA consented to the full

release of the land restrictions and the eventual closing of the airport, along with an almost immediate shortening of the runway at SMO to 3500 feet (with 30 days notice) and that "The City shall be responsible for complying with its state and federal environmental requirements related to its planning and implementation of modifications at SMO. The City's responsibility shall include the cost of conducting any necessary environmental studies or other requirements under the National Environmental Policy Act (NEPA). 42 U.S.C. § 4321 et seq." A true and correct copy of the consent decree is attached hereto as Exhibit 5.

22.    This action now arises from the fact that the City of Santa Monica improperly filed the lawsuit (13-CV-08046-JFW-VBKx) against the wrong federal agency in the first instance and also because the Federal Aviation Administration fully lacked any authority to grant the actual relief requested in that lawsuit and thereby both overstepped its authority and/or violated the Administrative Procedure Act (APA) in entering into the Consent Decree and by releasing lands pursuant to the 1984 agreement and that the FAA has failed to do little if any oversight regarding regulatory compliance by the City Santa Monica, ET AL as outlined below:

### Invalid Contract with Outside Counsel

23.    In the fall of 2013, the City Attorney hired an outside law firm (Morrison & Foerster) to bring a lawsuit against the Federal Aviation Administration on behalf of the City of Santa Monica. Pursuant to § 608 of the City Charter and § 2.24.073 of the Municipal Code, the City Attorney had to meet certain obligations in order to hire outside counsel, including but not limited to conducting a competitive search process via requests for proposals or by the express approval of the City Council.

24.    In October 2017, Plaintiff sought to obtain records pursuant to the California Public records Act (CA Government Code § 54950 et seq) to see if the City Attorney had met the obligations for hiring outside counsel Pursuant to § 608 of the City Charter and § 2.24.073 of the Municipal Code. No documents whatsoever were produced to demonstrate that the City Attorney (and/or City Council) had complied with all obligations required for hiring outside counsel.

25.    Plaintiff is informed and believes that City Attorney neither conducted a competitive search nor sought the express approval of the City Council as required by both the City Charter and Municipal Code and that the contract with Morrison & Foerster was invalid *ab initio* because of the failure to do so.

26.    Plaintiff is informed and believes that the contract with Morrison & Foerster should now be struck down by the invalid *ab initio*, along with all work product related thereto due the CSM's failure to comply with its own City Charter and Municipal Code in contracting with outside counsel.

## Wrong Party Was Sued by Santa Monica

27.    As discussed above, the 1948 Instrument of Transfer demonstrates that the contract was between the City of Santa Monica and the War Assets Administration (the successor of which is the General Services Administration) and not with the FAA (as it is also not the successor to the Civil Aeronautics Administration pursuant to the repeal of the War Surplus Act in 1949) and that the full relief sought under 13-CV-08046-JFW-VBKx could also not have been granted by the any of the successors as it would require an act of congress to fully release the entirety of an airport pursuant to a grant under the War Surplus Act of 1944. As such, it is clear that the wrong party was sued by the City of Santa Monica and thus the lawsuit was actually invalid *ab initio*. CSM should have sued amongst others, the General Services Administration and Congress and not the FAA.

28.     Plaintiff is informed and believes that the lawsuit was filed by CSM because of false assumptions it had made about the 1948 Instrument of Transfer, rather than the terms and conditions actually contained within it. Plaintiff further believes that numerous inappropriate actions taken by the FAA itself over time (including the 1984 agreement), have further promulgated these false assumptions by CSM.

29.     Plaintiff is informed and believes that had anyone taken the time to actually read and review the 1948 Instrument of Transfer, rather than make assumptions about what was in it, the lawsuit would either not have been improperly filed by CSM in the first instance or the FAA would have noticed that it was the wrong party and would have asked the court for a dismissal on that basis., which Plaintiff has no doubt would have been granted given the fact that the FAA was in effect a only caretaker who has granted certain oversight under the agreement, but is not an actual party the agreement itself.

30.     Plaintiff is informed and believes that the lawsuit should now be struck down by the invalid *ab initio* due the CSM's failure file an action against the correct party or parties.

## FAA Overstepped its Authority in the 1984 Agreement

31.     As discussed above, in 1984, the City of Santa Monica and FAA entered into an agreement that amongst other things, released land restrictions on portions of Santa Monica Airport for non-aviation purposes. While the FAA does have the ability under the 1948 Instrument of Transfer to recommend such a release of land(s), the actual release would need to come from successors of both the War Assets Administration (the successor of which is the General Services Administration) and statutory successor to the Administrator of the Civil aeronautics administration pursuant to various provisions of the United States

Code as codified by acts of Congress and/or by the required payment for removal of such land use restrictions (see paragraph 6, Instrument of Transfer).

32.     It is clear that the 1984 Agreement demonstrates that no consideration was ever given to the fact that a payment shall made to the War Assets Administration or successor thereto for the removal of such land use restrictions and thus the release of any land restrictions on portions of Santa Monica Airport for non-aviation purposes was invalid *ab initio*.

33.     While the 1984 Agreement expired in July of 2015, the remnants of said agreement remain, including the fact that CSM as recently as last year removed numerous acres of land at SMO from Aviation usage and intends to remove even more. Plaintiff is informed and also believes that the acres of land removed from aviation usage last year were in violation of the terms a federal grant assurance.

34.     Plaintiff is informed and believes that any releases of land restrictions on portions of Santa Monica Airport for non-aviation purposes pursuant to the 1984 agreement should now be struck down as invalid.

**Consent Decree is Invalid because FAA Overstepped its Authority**

35.     As discussed above, the 1948 Instrument of Transfer demonstrates that the contract was between the City of Santa Monica and the War Assets Administration (the successor of which is the General Services Administration) and not with the FAA (which is not the successor to Civil Aeronautics Administration) and that the full relief sought under 13-CV-08046-JFW-VBKx could never has been granted the FAA as it would take an act of congress to fully release the airport from obligations under the 1948 instrument of transfer pursuant to the War Surplus Act of 1944. As such, it is clear that the wrong party was sued by the City of Santa Monica and thus the lawsuit was actually invalid *ab initio*. Again, as noted above, CSM should at the very least have sued the General Services Administration and

not the FAA for the relief sought as the FAA is not a party to the 1948 Instrument of Transfer and as such had no authority whatsoever to fully release the City of Santa Monica from all of its obligations under 1948 Instrument of Transfer.

36.    It is also clear that under the 1948 Instrument of Transfer, that even if the FAA had authority (which it does not) such authority would only be limited authority to essentially recommending the release of portions of the airport property from restrictions for non-aviation purposes, and only if those purposes do not materially affect operation or maintenance of the Airport at which such property is located. It **does not** have any authority to allow closure of an airport as was improperly agreed to in the Consent Decree. Only the US Congress would have such authority.

37.    It is very clear that under 1948 Instrument of Transfer, in order to effect any release of lands, a payment **shall** be made to the War Assets Administration or successor thereto for the removal of such restrictions.

38.    It is clear that no such payments or any consideration thereof (or waiver thereof) was included in either the 1984 agreement or Consent Decree and therefore without such provisions for payment, etc. to the General Services Administration, the any release of lands is fully invalid.

39.    Plaintiff is informed and believes because FAA is not a party to the 1948 and because the FAA overstepped its authority in releasing the entire Airport and its lands from the 1948 Instrument of Transfer, when it clearly had no right to do so, the entire Consent Decree and certain provisions of the 1984 agreement should now be struck down as invalid.

### Administrative Procedure Act

40.    The Administrative Procedure Act (APA) provides a right to judicial review to any "person suffering legal wrong because of agency action." 5 U.S.C. § 702.

The APA defines agency action to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. §§ 551(13), 701(b)(2).

41.     The APA provides that a court shall compel an agency action that is "unlawfully withheld or unreasonably delayed," and shall hold unlawful and set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1) & (2)(A).

42.     5 U.S.C. § 706 provides that, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). The "arbitrary and capricious" standard forms a separate basis to set aside agency action, 5 U.S.C. § 706(2)(A),

43.     Plaintiff is informed and aware that Federal agencies are also required to consider the "reasonably foreseeable" effects of the proposed major Federal action, including effects that are direct, indirect, or cumulative. 40 C.F.R. §§ 1508.7, 1508.8, 1508.25., which Plaintiff believes that the FAA has not done as outlined below.

44.     Plaintiff alleges that FAA actions violated 5 U.S.C. sections 553, 705, and 706, and now seeks a declaratory judgment that Defendants acted arbitrarily, capriciously, contrary to law, abused their discretion, and failed to follow the required procedure in entering into and the Consent Decree and certain provisions of the 1984 agreement with the City of Santa Monica.

45.     As discussed above, the FAA is not a party to the 1948 Instrument of Transfer and therefore could not actually remove any land use restrictions on portions of Santa Monica Airport for non-aviation purposes as it did in the 1984 agreement without both including General Services Administration and making

provisions for the mandatory payment for such release. As it neither included the General Services Administration, nor made provisions for the mandatory payment, It is clear that the FAA overstepped its authority and acted arbitrarily, capriciously, contrary to law, abused their discretion, and failed to follow the required procedures.

46.    Also as discussed above, since the FAA is not a party to the 1948 Instrument of Transfer (and was wrongfully sued by the City), the FAA had no authority whatsoever to fully release the City of Santa Monica from all of its land use obligations under 1948 Instrument of Transfer and/or allow eventual closure as it did in the Consent Decree. Again, as it neither included the General Services Administration, nor made provisions for the mandatory payment for release, it is clear that the FAA overstepped its authority and acted arbitrarily, capriciously, contrary to law, abused their discretion, and failed to follow the required procedures.

47.    Even if the FAA had the right to enter into the Consent Decree (which it did not) FAA actions violated 5 U.S.C. sections 553 because it fully failed to consider the full effects of their actions in entering into the decree and the rights of all interested and/or affected parties. In brief, the FAA was required to obtaining public commentaries public in general and especially from affected parties. Such parties would include airport users such as Plaintiff, the United States Department of Defense and other US Agencies that have certain rights under 1948 Instrument of Transfer, along with other parties that have rights over Santa Monica Airport. Such other parties include the State of California, which has eminent domain under the California State Aeronautics Act (California Public Utilities Code § 21001 et seq.), the City of Los Angeles, which shares co-jurisdiction over the airport and/or the County of Los Angeles.

48.     At the time of the Consent Decree, there were Part 16 actions pending with the FAA against the City of Santa Monica related to various violations of various Federal obligations that were purportedly also settled as part of the Consent Decree. Plaintiff is informed and believes that the FAA had specific obligations to discuss possible resolution with the named Plaintiff's who filed those Part 16 actions.

49.     The FAA violated its obligations under the APA by granting the City of Santa Monica the right to shorten the runway (with 30 days notice) without having undertaken it obligations under NEPA to determine any possible detrimental effects that may occur to the National Airspace System.

50.     The FAA also violated its obligations under the APA by granting the City of Santa Monica the right to shorten the runway (with 30 days notice) without having considered the safety issues that would arise from pilots having outdated charts reflecting the wrong runway length information. The main charts relied upon by pilots are only published twice a year and Plaintiff is aware that there is a long lead-time to make any corrections or changes to those charts. As a result, if the City were to shorten the runway close to the time that such charts would be released, the changes will not be reflected until the next charts are released as much as 6 or more months later. As a result, a pilot relying on such outdated charts may put themselves into a very dangerous situation by flying into an airport where the runway is not long enough for either their arrival or departure.

51.     Plaintiff contends that the Court should order vacatur of the portions of the 1984 agreement wherein the FAA illegally and improperly released lands because it is required under the APA, see 5 U.S.C. § 706(2), and is the "standard remedy" when a court concludes that an agency's conduct was illegal under the APA.

52.     Plaintiff contends that the Court should order vacatur of the entire Consent Decree since the FAA fully lacked authority to enter into the agreement because it

is required under the APA, see 5 U.S.C. § 706(2), and is the "standard remedy" when a court concludes that an agency's conduct was illegal under the APA.

53.     Plaintiff contends that the Court should order vacatur of the entire Consent Decree since the failed to seek public and interested party input and otherwise failed to fully realize the effects of their actions, because it is required under the APA, see 5 U.S.C. § 706(2), and is the "standard remedy" when a court concludes that an agency's conduct was illegal under the APA.

### National Environmental Policy Act

54.     The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. Requires in part that a Federal agency consider the environmental impact of its proposed action, and calls for detailed statement is called an environmental impact statement or EIS pursuant to 42 U.S.C. § 4332(2)(C).

55.     Even if the consent decree were valid (which it is not), Plaintiff is informed and believes that the FAA failed to do an EIS of its own to determine any possible detrimental effects that may occur to the National Airspace System, ET AL in taking actions wherein it (improperly) entered into a Consent Decree with the City of Santa Monica wherein it granted the ability to shorten the runway to 3500 feet (on very short notice) and to eventually close the airport altogether. Such failure also constitutes a violation of the APA as asserted above.

56.     Even if the court consent decree were valid (which it is not) Plaintiff is aware that the City of Santa Monica has an obligation pursuant to Paragraph II (c) of the Consent Decree to perform Environmental Studies wherein the "City shall be responsible for complying with its state and federal environmental requirements related to its planning and implementation of modifications at SMO. The City's responsibility shall include the cost of conducting any necessary environmental

studies or other requirements under the National Environmental Policy Act (NEPA). 42 U.S.C. § 4321 et seq."

57.    Plaintiff is informed and believes that the City of Santa Monica plans to shorten the runway without complying with its Environmental Studies obligations pursuant to Paragraph II (c) of the Consent Decree.

58.    Plaintiff is informed and believes that the FAA has violated its obligation under the Consent Decree, ET AL to ensue that the City of Santa Monica has complied with all of its state and federal environmental requirements prior to allowing any shortening to begin. Such failure also constitutes a violation of both NEPA and the APA.

59.    Plaintiff is informed and believes that both the FAA and City of Santa Monica should be now ordered to comply with Environmental Requirement obligations pursuant to both state and federal law.

60.    Plaintiff is informed and believes that the FAA should be ordered not to allow the shortening of the runway until such time as all Environmental Requirements are met by the City of Santa Monica.

## Violation of the State Aeronautics Act and CEQA

61.    The California State Aeronautics Act (California Public Utilities Code Section 21001 et seq.) governs various matters relative to aviation in this state. places a number of licensing and other requirements on public airport operators.

62.    Public Utilities Code (PUC), Section 21675(a) requires preparation of an airport land use compatibility plan (ALUCP) for each public use airport in the state.

63.    The ALUCP is designed to encourage compatible land uses in the vicinity surrounding an airport. It provides for the "orderly growth of each public airport and the area surrounding the airport" while safeguarding "the general welfare of the inhabitants within the vicinity of the airport and the public in general (PUC

Section 21675(a)).” The ALUCP contains criteria for making consistency determinations, including building standards and height and land use restrictions.

64.      An ALUCP must be formulated for “each public airport” (i.e., as in this case, an airport operated for the benefit of the general public) within the jurisdiction of the Airport Land Use Commission (ALUC) (Section 21675(a)).

65.      Prior to the amendment of a general plan or specific plan, or the adoption of a zoning ordinance or building regulation within the ALUCP planning boundary, the ALUC shall review the plan, ordinance, or regulation for consistency with the ALUCP (PUC Section 21676(b)).

66.      The adoption or amendment of an ALUCP is a “project” under California Environmental Quality Act (CEQA; Public. Resources Code (PRC), Section 21000 et seq.) and thus requires an Environmental Impact Report be done.

67.      Plaintiff is informed and believes that the City of Santa Monica has consistently failed in its obligations under the State Aeronautics Act to prepare and submit and airport land use compatibility plans (ALUCP) to the LA County Airport Land Use Commission (ALUC) and that it so doing, it has also violated its obligations under CEQA.

68.      Plaintiff has personally checked with the LA County Airport Land Use Commission to see if the City of Santa Monica ever submitted ALUCP related to the 1984 agreement and found that it did not do so.

69.      Plaintiff is informed and believes that the City of Santa Monica now intends to proceed with construction (i.e. shortening the runway) without first having submitted a new ALUCP for approval by the LA county ALUC and conducting required environmental studies related thereto.

70.      Plaintiff is informed and believes that because the City entered into the consent decree allowing it to both shorten the runway and to close the airport, the

City was required to notify the State of California pursuant to Section 21605 so that it may determine if such activities will have impact on the entire state air transportation system and so that it can take steps to protect entire state air transportation system from any impact that such activities might create.

71.    Plaintiff believes that the State of California has eminent domain to take steps to prevent the City of Santa Monica from making changes or closing the airport should it feel that such activities will have impact on the entire state air transportation system, including but not limited to taking possession of the airport.

72.    Plaintiff is informed and believes that actions of the City of Santa Monica and the FAA will have a negative impact on the entire state air transportation system.

73.    Plaintiff is informed and believes that the City of Santa Monica has failed in its obligations under the California Public Utilities Code Section 21001 et seq, CEQA and specifically Section 21605 and therefore should be enjoined from doing any work on the airport until such time as the city fully complies with its obligations and/or the State has been given the opportunity to take its own appropriate action and be ordered to comply with all state regulations under the Aeronautics act.

**Consent Decree is Invalid due to City Council Conflict of Interest.**

74.    Plaintiff is informed and believes that certain Santa Monica City Council members (including Santa Monica Councilman Tony Vazquez) who voted to approve the Consent Decree with the FAA were prohibited form voting for the decree as they are affected parties pursuant to the California Political Reform Act Gov. Code, § 87100 et seq. Plaintiff is further informed and believes that had they recused themselves as required by law for conflict of interest, the City Council would have lacked enough votes to approve entry into the Consent Decree.

75.     Plaintiff is informed and believes that the votes of such conflicted city council members should now be struck down for failure to recuse themselves from voting, which would mean that the resolution to approve Consent Decree did not have enough votes to have been approved.

## Violation of the Local Regulations and CEQA

76.     As discussed above the City of Santa Monica shares co-jurisdiction over the Santa Monica Airport because the eastern portion is located in the City of Los Angeles. As a result of this co- jurisdiction, the City of Santa Monica would need to seek all appropriate approvals by the City of Los Angeles (and its City Council) pursuant to the Los Angeles City Charter and Municipal code prior to any activities or construction that involves the Los Angeles portion of the Airport. This would also include providing the City of Los Angeles with Environmental impact reports to the City of Los Angeles as required under CEQA.

77.     Plaintiff is informed and believes that the City of Santa Monica has and continues to completely ignore that fact that it lacks full sovereign jurisdiction of the Airport and thereby fails to seek appropriate approvals, construction permits etc. from the City of Los Angeles.

78.     Plaintiff is informed and believes that that City of Santa Monica previously built parking lots that it rents out to Car Dealerships for the storage of cars, without first having sought appropriate approvals from the City of Los Angeles.

79.     Plaintiff is informed and believes that that City of Santa Monica has approved a plan for the shortening of the runway that involves construction on/in the City of Los Angeles portion of the airport and that it has failed to take steps to seek appropriate approvals, construction permits etc. from the City of Los Angeles.

80.     Plaintiff is also aware that Santa Monica Airport is essentially bounded on 3 sides by City of Los Angeles and that the City of Santa Monica plans on doing

construction work from 9pm to 7am less than a few hundred feet from residences located in the City of Los Angeles. Plaintiff is informed and believes that such activities are a serious violation of the City of Los Angeles municipal code and also that neighbors of the airport will likely not be happy with such late night activities.

81.    Plaintiff is informed and believes that the City of Santa Monica should now be ordered to comply with all local regulations related to the City of Los Angeles portion of the airport.

**Failure to Enforce Federal Regulations Governing Public Airports**

82.    Plaintiff is informed and believes that the FAA has consistently failed to enforce its regulations related to Santa Monica Airport. Plaintiff is aware of numerous violations of such regulations, including the fact that the City of Santa Monica has been very discriminatory towards aviation in general and has engaged in numerous activities to keep or otherwise exclude aviation interest from the airport, including but not limited to setting up a business licensing system wherein it has routinely denied licenses for aviation related activities.

83.    Plaintiff is informed and aware that the City of Santa Monica has engaged in numerous activities that involve revenue diversion, wherein the City has rented buildings, spaces, etc. for non-aviation activities at below market rates and/or has used the airport facilities for its own purposes without payment for said usage to name a few. The City has fully admitted to such revenue diversion to the FAA in response to a Part 16 filing that alleged such diversion, yet the FAA has never taken any action whatsoever.

84.    Plaintiff is informed and aware that that numerous hangers (as many as ¼ or more of all the hangers) located at the airport are occupied by non-aviation activities in violation of numerous FAA policies. Plaintiff is also aware that at least

another ¼ of the hangers are currently unoccupied due to the fact that the City is discriminating against aviation by trying to charge rental fees that are far higher than any other airport in the region and that may be in violation of other city regulations. Plaintiff is also on the hanger waiting list (which is very long) and has been on it for a couple of years.

85.   Plaintiff is informed and believes that the City of Santa Monica also violated numerous FAA policies when it instituted the current landing fees at SMO, yet the FAA has never taken any action whatsoever to see if those fees are both legal and warranted.

86.   Plaintiff is also aware that the City of Santa Monica specifically violated it federal grant obligations when it recently closed off a section of the airport to aviation, when it had used federal grant money for improvement of the section of the airport.

87.   Plaintiff is informed and believes that the FAA should now be ordered to take steps to fully ensure that the City of Santa Monica complies with all of its regulations. Plaintiff also believes that the City of Santa Monica should be ordered to comply with all FAA regulations

### Equitable Estoppel Issue RE runway shortening

88.   Plaintiff is aware that the City of Santa Monica has an Equitable Estoppel issue/problem related to the shortening of the Runway, which likely precludes it from arguing for the shortening of the runway at this time. The City is currently involved in a lawsuit (LA Superior Court case BC603327, Justice Aviation et al, v. City of Santa Monica) over landing and fuel flow fees that have been imposed/charged at the airport by the City. In that case, the City has/is arguing that such fees are "Essential" for the operation of the Airport, yet by now trying to make the case that it needs to shorten the runway, it is fully arguing against itself,

because the largest payers percentage wise of both landing fees and fuel flow fees are the Jets, which the City is now trying to preclude from the airport. Thus if such fees are that essential for the operation of the airport, then the City should be precluded from shortening the runway.

89.     Plaintiff is informed and believes that the City of Santa Monica should now be enjoined from making its contradictory agreements pursuant to the Doctrine of Equitable Estoppel. The City now needs to make a choice whether it argue that it needs the fees or that it wants to shorten the runway, but it cannot do both.

90.     Plaintiff is now entitled to a preliminary and permanent injunction-restraining Defendants from engaging in further illegal acts and potentially causing irreparable damage to Plaintiff and others similarly situation which Plaintiff has no adequate remedy of law.

## FIRST CLAIM FOR RELIEF
## DECLARATORY RELIEF

91.     Plaintiff incorporates by reference each allegation contained in the foregoing paragraphs of this Complaint and Exhibits as if fully set forth herein.

92.     Plaintiff brings this cause of action as a Private Attorney General under the Private Attorney General Doctrine in the public interest as of other persons similarly affected or situated.

93.     As discussed above, Plaintiff is informed and believes that because the City failed to properly contract with outside counsel, the court should declare the contract and work product related thereto including lawsuit, 13-CV-08046-JFW-VBKx invalid ab initio such failure.

94.     As discussed above, Plaintiff is informed and believes that because the City of Santa Monica improperly sued the FAA, when it should have at a minimum sued the General Services Administration, and because it is clear that the wrong

party was sued by the City of Santa Monica, the court should declare the lawsuit, 13-CV-08046-JFW-VBKx invalid ab initio for failure file an action against the correct party.

95.    Also as discussed above, Plaintiff is informed and believes that because the City sued the wrong entity and because FAA is not a party to the 1948 instrument of transfer and because the FAA overstepped its authority entering into the Consent Decree when it clearly had no right to do so, the court should declare that the entire Consent Decree is invalid *ab initio* due to the fact that the FAA had no actual authority to enter into such a Consent decree.

96.    Plaintiff contends that the Court should order vacatur of the entire Consent Decree since the FAA fully lacked authority to enter into the consent decree because it is required under the APA, see 5 U.S.C. § 706(2), and is the "standard remedy" when a court concludes that an agency's conduct was illegal under the APA.

97.    Also as discussed above, Plaintiff is informed and believes that because the FAA lacked authority to release land restrictions on portions of Santa Monica Airport for non-aviation purposes without both approval and fees being paid to the General Services Administration pursuant to the 1948 Instrument of Transfer agreement the court should now declare that any such releases pursuant to the 1984 agreement were invalid *ab initio*.

98.    Also as discussed above Plaintiff is informed and believes that the votes of conflicted city council members should now be struck down for failure to recuse themselves from voting.

99.    Plaintiff contends that the Court should order vacatur of the portions of the 1984 agreement wherein the FAA illegally and improperly released lands because

FIRST AMENDED PETITION OF WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

25

it is required under the APA, see 5 U.S.C. § 706(2), and is the "standard remedy" when a court concludes that an agency's conduct was illegal under the APA.

100.   As discussed above, even if the court should somehow find that both the lawsuit and Consent Decree were valid, Plaintiff contends that the Court should order vacatur of the entire Consent Decree since the FAA violated the APA by failing comply with NEPA and to seek public and interested party input and otherwise failed to fully realize the effects of their actions, because it is required under the APA, see 5 U.S.C. § 706(2), and is the "standard remedy" when a court concludes that an agency's conduct was illegal under the APA.

101.   An actual controversy exists between the parties concerning the actions of both the FAA and City of Santa Monica related to the lawsuit and related consent decree resulting from that lawsuit.

102.   A judicial determination resolving this actual controversy is necessary and appropriate at this time.

103.   This determination is necessary and proper because Respondents refuse to conform to the requirements of both State and Federal law

## SECOND CLAIM FOR RELIEF
## WRIT OF MANDATE

104.   Plaintiff incorporates by reference each allegation contained in the foregoing paragraphs of this Complaint and all Exhibits as if fully set forth herein.

105.   Plaintiff brings this cause of action as a Private Attorney General under the Private Attorney General Doctrine in the public interest as of other persons similarly affected or situated.

106.   By the actions alleged above, Plaintiff believes that the Court should now order the FAA take steps to fully ensure that it complies with the APA and NEPA.

107.   By the actions alleged above, Plaintiff believes that the Court should now order the FAA take steps to fully ensure that the City of Santa Monica complies with all of its (FAA) regulations.

108.   By the actions alleged above, Plaintiff believes that the Court should now order the City of Santa Monica to comply with all of its environmental obligations, including but not limited to compliance with both NEPA and CEQA.

109.   By the actions alleged above, Plaintiff believes that the Court should now order the City of Santa Monica comply with all FAA regulations.

110.   By the actions alleged above, Plaintiff believes that the Court should now order the City of Santa Monica should now be ordered to comply with all State and local regulations and specifically those related to the City of Los Angeles portion of the airport.

111.   An actual controversy exists between the parties concerning the actions of both the FAA and City of Santa Monica related to the lawsuit and related consent decree resulting from that lawsuit.

112.   A judicial determination resolving this actual controversy is necessary and appropriate at this time.

113.   This determination is necessary and proper because Respondents refuse to conform to the requirements of both State and Federal law

## THIRD CLAIM FOR RELIEF

## INJUNCTIVE RELIEF

114.   By Defendants continuing to engage in such actions as alleged above, Plaintiff (and those similarly situated) have been and will continue to be harmed by Defendants illegal actions related to the illegal and improper Consent Decree entered into by the parties.

115.   Defendants have continually and consistently demonstrated that they know no legal bounds and that only by being enjoined by order of this Court, might the illegal improper actions by Defendants cease.

116.   In addition, if not enjoined by order of this Court, Defendant will continue to engage in such illegal in improper actions related to the invalid portions of both the 1984 Agreement and the Consent Decree.

117.   Plaintiff does not have a plain, speedy, and adequate remedy in the ordinary course of law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

118.   A declaration that the lawsuit, 13-CV-08046-JFW-VBKx was invalid *ab initio* due to the failure of the City of Santa Monica to properly contract with outside counsel.

119.   A declaration that the lawsuit, 13-CV-08046-JFW-VBKx was invalid *ab initio* due to the failure of the City of Santa Monica to properly file an action against the correct party.

120.   A declaration that the Consent Decree in lawsuit, 13-CV-08046-JFW-VBKx was invalid *ab initio* due to fact that the FAA was named incorrectly and thereby lacked authority to enter in the decree in the first instance.

121.   A declaration that the Consent Decree in lawsuit, 13-CV-08046-JFW-VBKx was invalid *ab initio* due to fact that the conflicted city council members voted approving the Consent Decree and without such votes, the required approval would not have ratified by City Council.

122.   A declaration that the Court orders vacatur of the Consent Decree in lawsuit, 13-CV-08046-JFW-VBKx pursuant to 5 U.S.C. § 706(2), because the FAA violated the APA.

FIRST AMENDED PETITION OF WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

28

123.   A declaration that the Court orders vacatur of the of the portions of the 1984 agreement wherein the FAA illegally and improperly released lands pursuant to 5 U.S.C. § 706(2), because the FAA violated the APA and also lacked proper authority to release such lands.

124.   For a writ of mandate directing that the FAA take steps to fully ensure that it complies with the APA and NEPA.

125.   For a writ of mandate directing that the FAA fully ensure that the City of Santa Monica complies with all of its (FAA) regulations.

126.   For a writ of mandate directing that the City of Santa Monica to comply with all of its environmental obligations, including but not limited to compliance with both NEPA and CEQA and with all FAA regulations.

127.   For a writ of mandate directing that the City of Santa Monica should now comply with all State and local regulations and specifically those related to the City of Los Angeles portion of the airport.

128.   For a writ of mandate directing that will retain jurisdiction to ensure that the continues to complies with all (FAA) regulations and that the FAA will need to come to the court for further action in the event that the City is unwilling or unable to comply.

129.   For a writ of mandate directing that if in the City is unwilling to continue to operate the airport in compliance with its obligations that the FAA is to either take possession of Santa Monica Airport or find a party to take over operation of the airport.

130.   For preliminary injunctive relief as necessary the City of Santa Monica should now be enjoined from making its contradictory agreements pursuant to the Doctrine of Equitable Estoppel and for a writ of mandate directing that City now

needs to make a choice whether it argue that it needs the fees or that it wants to shorten the runway, but that it cannot do both.

131.   For preliminary and permanent injunctive relief as necessary and appropriate to cease any actions or activities related to the Consent Decree, included but not limited to shortening of the runway and construction work related thereto, release of restrictions on Airport lands and/or closure of the airport in any way related to the Consent Decree until such time as a full hearing is held by the court.

132.   For such further orders or declarations, as appropriate, declaring that the FAA and City of Santa Monica violated their ministerial obligations.

133.   For fees and costs.

134.   For Attorneys fees (if applicable)

135.   For Attorneys fees under Government Code 54960.5

136.   For such other and further relief as this Court deems just and appropriate.

Dated: November 14, 2017

By: _____
Barry Rosen, In Propria Persona

## **Verification**

I, Barry Rosen, declare:

I am acting In Propria Persona with respect to this action. I have read the foregoing Complaint for Declaratory and Injunctive Relief and know its contents. I am informed and believe that the matters stated therein are true and on that ground allege that the matters stated therein are true.

      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: November 14, 2017

 

                                   Barry Rosen

# Exhibit 1



La Neighbors

# Exhibit 2



**City of Santa Monica** | **SM MAP**

Tools


Home


Pan


Zoom In


Zoom Out


Initial View


Print


Export


Identify



I want to...

In the Search field on the *top right*, enter an address (*1685 Main St*) or place such as "Reed Park", "Fire Station", or "City Hall"



*Then zoom to the location by clicking on the* **results**



Change visible map layers with this button *(bottom of window)*



Return to this screen with this button *(bottom of window)*



Change Base Maps (Imagery and Streets) with this bottom on the bottom the map



Use the Identify Tool to get information (such as Parcel Details) about **visible** layers



**Disclaimer:**

*This map of the City of Santa Monica has been provided for illustration purposes only. Every reasonable effort has been made to ensure the accuracy of the maps provided, however, some information may not be accurate. The City of Santa Monica ("City") provides this map on an "AS IS"*



Streets B...

SANTA MONICA

# Exhibit 3

KNOW ALL MEN BY THESE PRESENTS:

Deed # 1 CCS

That, the UNITED STATES OF AMERICA, acting by and through the WAR ASSETS ADMINISTRATION under and pursuant to Reorganization Plan One of 1947 (12 F.R. 4534), and the powers and authority contained in the provisions of the Surplus Property Act of 1944, as amended, and applicable rules, regulations, and orders, PARTY OF THE FIRST PART, in consideration of the assumption by the CITY OF SANTA MONICA, a body corporate and politic under the laws of the State of California, PARTY OF THE SECOND PART, of all the obligations and its taking subject to certain reservations, restrictions, and conditions and its covenant to abide by and agreement to certain other reservations, restrictions, and conditions, all as set out hereinafter, has remised, released and forever quitclaimed, and by these presents does remise, release, and forever quitclaim to said City of Santa Monica, its successors and assigns, under and subject to the reservations, restrictions, and conditions, exceptions, and reservation of rights hereinafter set out, all its right, title, interest, and claim in and to the following described real, personal, or mixed property situated in the County of Los Angeles, State of California, to wit:

(1)  Tract #1 - A temporary easement granted by Raymond E. Wright and Lula Nancy Marter Wright, husband and wife to the United States of America, by easement deed dated 21 October 1942, for right-of-way to locate, relocate, construct, reconstruct, maintain, repair, operate, renew, enlarge, remove and replace, increase and/or change the number and/or size of conduits, pipes, pipe lines, accessories and appurtenances for the conveyance and disposal of sewage and/or effluent under, over, along and upon that certain land situated in the County of Los Angeles, State of California, described as follows:

A strip of land 10 feet in width, situate in the City of Los Angeles, County of Los Angeles, State of California, being under and across a portion of Lot 94, Tract No. 12460, as per map recorded in Book 235, Pages 20 and 21 of Maps, Records of Los Angeles County, lying 5 feet on each side of the following described center line.

Beginning at the intersection of the Southeasterly line of said Lot 94 with the center line of Wasatch Avenue, (50 feet in width), said point being North 32° 34' 40" West, a distance 138.81 feet from the intersection of the center line of Wasatch Avenue and the center line of Woodgreen Street (60 feet in width); thence North 32° 34' 40" West along the Northwesterly prolongation of the center line of Wasatch Avenue a distance of 44.00 feet to a point in the Northwesterly line of said Lot 94, containing 440 square feet, more or less.

(2)  Tract #2 - A temporary easement granted by the Southern California Water Company, a corporation organized and existing under and by virtue of the laws of the State of California, to the United States of America, by easement deed dated 22 October 1942, for right-of-way to locate, relocate, construct, reconstruct, maintain, repair, operate, renew, enlarge, remove and replace, increase and/or change the number and/or size of conduits, pipes, pipe lines, accessories and appurtenances for the conveyance and disposal of sewage and/or effluent under, over, along and upon that certain land situated in the County of Los Angeles, State of California, described as follows:

A strip of land 10 feet in width, situate in the City of Los Angeles, County of Los Angeles, State of California being under and across a portion of the Subdivision of the Lands of Samuel Cripe in the Rancho La Ballona as per map recorded in Book 1, Page 64,

Licensed Surveyors Maps, Records of said County lying 5 feet on each
side of the following described center line: Beginning at the inter-
section of the Northwesterly line of Lot 94, Tract No. 12450, as per
map recorded in Book 236, Pages 20 and 21 of Maps, Records of Los
Angeles County, with the Northwesterly prolongation of the center
line of Wasatch Avenue, (50 feet in width) said point being N 32°
34' 40" West, a distance of 182.81 feet from the intersection of the
center line of Wasatch Avenue and the center line of Woodgreen
Street, (60 feet in width); thence North 52° 34' 40" West along
the Northwesterly prolongation of the center line of Wasatch Avenue,
a distance of 16 feet to the Northwesterly line of said Subdivision
of the Lands of Samuel Cripe in the Rancho La Ballona, containing
160 square feet, more or less.

(3)  Tract #3 - A temporary easement granted by the Bank
of America National Trust & Savings Association, a national banking
association, owners, and Gore Bros. Inc., a corporation organized
and existing under and by virtue of the laws of the State of Cali-
fornia, Vendee, under a land purchase contract, to the United States
of America, by easement deed dated 21 October 1942, for right-of-way
to locate, relocate, construct, reconstruct, maintain, repair,
operate, renew, enlarge, remove and replace, increase and/or change
the number and/or size of conduits, pipes, pipe lines, accessories
and appurtenances for the conveyance and disposal of sewage and/or
effluent under, over, along and upon that certain land situated in
the County of Los Angeles, State of California, described as follows:

A strip of land 10 feet in width situate in the City of
Los Angeles, County of Los Angeles, State of California, being under
and across a portion of the 10.70 Acres of Fractional Jose De La Luz
Machado 61.97334 Acres in the Rancho La Ballona, (District Court
Case Number 2722) as per map recorded in Book 3, Pages 204 to 209
inclusive, Miscellaneous Records of Los Angeles County, lying 5 feet
on each side of the following described center line: Beginning at
the intersection of the Southeasterly line of said Fractional Jose
De Luz Machado 61.97334 Acres with the Northwesterly prolongation of
the center line of Wasatch Avenue (Wasatch Avenue shown on Tract No.
12450, as per map recorded in Book 236, Pages 21 and 20 of Maps,
Records of said County) said point being North 32° 34' 40" West along
the Northwesterly prolongation of the center line of Wasatch Avenue,
a distance of 198.81 feet from the intersection of the center line
of Wasatch Avenue (50 feet in width) and the center line of Woodgreen
Street (60 feet in width); thence North 32° 34' 40" West 11.19 feet;
thence North 65° 08' 43" West 442.15 feet to a point in the North-
westerly line of said Fractional Jose De Luz Machado 61.97334 Acres,
containing 4533 square feet, more or less.

(4)  Tract #4 - A temporary easement granted by Gore Bros.
Inc., a corporation organized and existing under and by virtue of
the laws of the State of California, to the United States of America,
by easement deed dated 20 October 1942, for right-of-way to locate,
relocate, construct, reconstruct, maintain, repair, operate, renew,
enlarge, remove and replace, increase and/or change the number and/or
size of conduits, pipes, pipe lines, accessories and appurtenances
for the conveyance and disposal of sewage and/or effluent under,
over, along and upon that certain land situated in the County of Los
Angeles, State of California, described as follows:

A strip of land 10 feet in width, situate in the City of
Los Angeles, County of Los Angeles, State of California, being under
and across a portion of Fractional Jose De La Luz Machado 61.97334
Acres in the Rancho La Ballona (District Court Case No. 2722) as per
map recorded in Book 3, Pages 204 to 209 inclusive, Miscellaneous
Records of Los Angeles County, lying 5 feet on each side of the
following described center line: Commencing at the intersection of

the center line of Wasatch Avenue (60 feet in width),
Street (60 feet in width), shown on Tract No. 12450, as per map
recorded in Book 235, Pages 20 and 21 of Maps, Records of Los
Angeles County; thence North 32° 34' 40" West along the center
line and prolongation of the center line of said Wasatch Avenue,
a distance of 210.00 feet; thence North 65° 08' 43" West 442.15
feet to the TRUE POINT OF BEGINNING.  Thence North 65° 08' 43"
West 425.10 feet; thence North 33° 33' 55" West 25.59 feet to
the point of termination in the Southeasterly line of Woodbine
Avenue (27 feet wide) shown on Tract No. 12367 as per map recor-
ded in Book 249, Page 13 of Maps, Records of Los Angeles County;
said point of termination being North 57° 11' 50" East 25.50 feet
from the most Southerly corner of said Tract No. 12367.

(5)  Tract #5 - A temporary right-of-way for construc-
tion, operation, maintenance, renewal, and removal of a sewer line
along, across, beneath and over the following described property,
to wit:

The Southwesterly ten (10) feet of Lot 62 of Tract 12367,
in the City of Los Angeles, County of Los Angeles, State of Califor-
nia, as per map recorded in Book 249, Pages 12 and 13 of Maps, re-
cords in the Office of the County Recorder of said County and State,
granted by a lease entered into by and between the Bank of America
National Trust and Savings Association, a National Banking Associa-
tion, and the United States of America, on 1 September 1942, as
modified by Supplemental Agreements:  #1, dated 10 January 1944,
#2, dated 31 July 1944, #3, dated 4 August 1945, and #4, dated 30
December 1945, which was duly transferred and assigned to the
Capital Company, a California Corporation, on 7 September, 1945.

(6)  That certain sewer pipe line constructed pursuant
to and all rights acquired by, that certain Resolution of 9 October
1942, in the Minutes of the Board of Public Works, City of Los
Angeles, Page 205, Book No. 325, granting permission to the Federal
Government to install a sanitary sewer in Stewart Avenue between
Rose Avenue and Woodbine Streets.

(7)  Those certain chattels enumerated in Schedule "A"
attached hereto and made a part hereof as though fully set forth
hereat.

EXCEPTING, HOWEVER, from this conveyance all right, title,
and interest in and to all property in the nature of equipment,
furnishing, and other personal property located on the land leased
from the City of Santa Monica as hereinafter set out, which can be
removed from the land without material injury to the land or struc-
tures located thereon, other than those chattels enumerated in
Schedule "A" attached hereto and made a part hereof as though fully
set forth hereat, and reserving to the PARTY OF THE FIRST PART for
itself and its lessees, licensees, permitees, agents, and assigns
the right to use the property excepted hereby in such a manner as
will not materially and adversely affect the development, improve-
ment, operation or maintenance of the airport and the right of re-
moval from said premises of such property, all within a reasonable
period of time after the date hereof, which shall not be construed
to mean any period more than one (1) year after the date of this in-
strument, together with a right of ingress to and egress from said
premises for such purposes.

Further, the PARTY OF THE FIRST PART, for the consideration
hereinabove expressed, does hereby surrender, subject to the terms
and conditions of this instrument, to the PARTY OF THE SECOND PART,
the former's leasehold interest in and to the premises known as
"Clover Field, Santa Monica Municipal Airport", set forth and des-
cribed in Lease No. W-04-193-Eng-4894, dated 8 December, 1941, as

modified by Supplemental Agreements: #1, dated July 29, 1943, and #2,
dated July 15, 194_, and in Lease No. W-3460-Eng-549, dated December 1,
1941, as modified by Supplemental Agreements: #1, dated December 20,
1944, and #2, dated July 15, 1946, both from the City of Santa Monica
to the United States of America, and including 168.87 acres, more or
less of land situated in the County of Los Angeles, State of California.

THE PARTY OF THE SECOND PART does hereby release the PARTY
OF THE FIRST PART from any and all claims which exist or may arise
under the provisions of the aforesaid lease, except claims which may
be submitted under Section 17 of the Federal Airport Act.

Said property transferred hereby was duly declared sur-
plus and was assigned to the War Assets Administration for disposal,
acting pursuant to the provisions of the above-mentioned Act, as
amended, Reorganization Plan One of 1947 and applicable rules,
regulations and orders.

THAT THE PARTY OF THE FIRST PART has released and quit-
claimed, and by this instrument does release and quitclaim to the
PARTY OF THE SECOND PART all of the structures and improvements
on the leased land, including underground and overhead utility
systems, which were added thereto by PARTY OF THE FIRST PART.

That by the acceptance of this instrument or any rights
hereunder, the said PARTY OF THE SECOND PART, for itself, its
successors, and assigns, agrees that the aforesaid surrender of
leasehold interest, transfer of structures, improvements and
chattels, and assignment, shall be subject to the following re-
strictions, set forth in subparagraphs (1) and (2) of this para-
graph, which shall run with the land, imposed pursuant to the
authority of Article 4, Section 3, Clause 2 of the Constitution
of the United States of America, the Surplus Property Act of 1944,
as amended, Reorganization Plan One of 1947 and applicable rules,
regulations and orders:

(1)  That, except as provided in subparagraph (6) of the next
succeeding unnumbered paragraph, the land, buildings, structures,
improvements and equipment in which this instrument transfers any
interest shall be used for public airport purposes for the use and
benefit of the public, on reasonable terms and without unjust dis-
crimination and without grant or exercise of any exclusive right
for use of the airport within the meaning of the terms "exclusive
right" as used in subparagraph (4) of the next succeeding paragraph.
As used in this instrument, the term "airport" shall be deemed to
include at least all such land, buildings, structures, improvements
and equipment.

(2)  That, except as provided in subparagraph (6) of the next
succeeding paragraph, the entire landing area, as defined in WAA
Regulation 16, dated June 26, 1946, and all structures, improve-
ments, facilities and equipment in which this instrument transfers
any interest shall be maintained for the use and benefit of the
public at all times in good and serviceable condition, provided,
however, that such maintenance shall be required as to structures,
improvements, facilities and equipment only during the remainder of
their estimated life, as determined by the Civil Aeronautics Admin-
istrator or his successor.  In the event materials are required to
rehabilitate or repair certain of the aforementioned structures,
improvements, facilities or equipment, they may be procured by demolition of
other structures, improvements, facilities or equipment transferred
hereby and located on the above described premises which have outlived
their use as airport property in the opinion of the Civil Aeronautics
Administrator or his successor.

That  y the acceptance of this instrumen  , or any rights hereunder, the PARTY OF THE SECOND PART, for itself, its successors and assigns, also assumes the obligations of, covenants to abide by and agrees to, and this surrender, transfer, and assignment is made subject to, the following reservations and restrictions set forth in subparagraphs (1) to 47) of this paragraph, which shall run with the land, imposed pursuant to the authority of Article 4, Section 3, Clause 2 of the Constitution of the United States of America, the Surplus Property Act of 1944, as amended, Reorganization Plan One of 1947 and applicable rules, regulations and orders.

(1)    That insofar as it is within its powers, the PARTY OF THE SECOND PART shall adequately clear and protect the aerial approaches to the airport by removing, lowering, relocating, marking or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards.

(2)    That the United States of America (hereinafter sometimes referred to as the "Government") through any of its employees or agents shall at all times have the right to make nonexclusive use of the landing area of the airport at which any of the property transferred by this instrument is located or used, without charge: Provided, however, that such use may be limited as may be determined at any time by the Civil Aeronautics Administrator or his successor to be necessary to prevent undue interference with use by other authorized aircraft:  Provided, further, that the Government shall be obligated to pay for damages caused by such use, or if its use of the landing area is substantial, to contribute a reasonable share of the cost of maintaining and operating the landing area, commensurate with the use made by it.

(3)    That during any national emergency declared by the President of the United States of America or the Congress thereof, the Government shall have the right to make exclusive or nonexclusive use and have exclusive or nonexclusive control and possession, without charge, of the airport at which any of the property transferred by this instrument is located or used, or of such portion thereof as it may desire, provided, however, that the Government shall be responsible for the entire cost of maintaining such part of the airport as it may use exclusively, or over which it may have exclusive possession or control, during the period of such use, possession, or control, and shall be obligated to contribute a reasonable share, commensurate with the use made by it, of the cost of maintenance of such property as it may use nonexclusively or over which it may have nonexclusive control and possession; Provided, further, that the Government shall pay a fair rental for its use, control, or possession, exclusively or nonexclusively of any improvements to the airport made without United States aid.

(4)    That no exclusive right for the use of the airport at which the property transferred by this instrument is located shall be vested (directly or indirectly) in any person or persons to the exclusion of others in the same class, the term "exclusive right" being defined to mean

(1)  any exclusive right to use the airport for conducting any particular aeronautical activity requiring operation of aircraft;

(2)  any exclusive right to engage in the sale or supplying of aircraft, aircraft accessories, equipment, or supplies (excluding the sale of gasoline and oil), or aircraft services necessary for the operation of aircraft (including the maintenance and repair of aircraft, aircraft engines, propellers, and appliances).

(5)     That  xcept as provided in subparagrap  6) of this para-
graph, the property transferred hereby may be successively transferred
only with the proviso that any such subsequent transferee assumes all
the obligations imposed upon the PARTY OF THE SECOND PART by the pro-
visions of this instrument.

(6)     That no property transferred by this instrument shall be
used, leased, sold, salvaged, or disposed of by the PARTY OF THE
SECOND PART for other than airport purposes without the written con-
sent of the Civil Aeronautics Administrator, which shall be granted
only if said Administrator determines that the property can be used,
leased, sold, salvaged or disposed of for other than airport purposes
without materially and adversely affecting the development, improve-
ment, operation or maintenance of the airport at which such property
is located; Provided, that no structures disposed of hereunder shall
be used as an industrial plant, factory, or similar facility within
the meaning of Section 23 of the Surplus Property Act of 1944, as
amended, unless the PARTY OF THE SECOND PART shall pay to the United
States such sum as the War Assets Administrator or his successor in
function shall determine to be a fair consideration for the removal
of the restriction imposed by this proviso.

(7)     The PARTY OF THE SECOND PART does hereby release the
Government, and will take whatever action may be required by the
War Assets Administrator to assure the complete release of the
Government from any and all liability the Government may be under
for restoration or other damages under any lease or other agreement
covering the use by the Government of the airport, or part thereof,
owned, controlled or operated by the PARTY OF THE SECOND PART, upon
which, adjacent to which, or in connection with which, any property
transferred by this instrument was located or used; Provided, that
no such release shall be construed as depriving the PARTY OF THE
SECOND PART of any right it may otherwise have to receive reimburse-
ment under Section 17 of the Federal Airport Act for the necessary
rehabilitation or repair of public airports heretofore or hereafter
substantially damaged by any Federal agency.

        By acceptance of this instrument, or any right hereunder,
the PARTY OF THE SECOND PART further agrees with the PARTY OF THE
FIRST PART as follows:

        (1)  That in the event that any of the aforesaid terms,
conditions, reservations or restrictions is not met, observed, or
complied with by the PARTY OF THE SECOND PART or any subsequent
transferee, whether caused by the legal inability of said PARTY OF
THE SECOND PART or subsequent transferee to perform any of the
obligations herein set out, or otherwise, the title, right of pos-
session and all other rights transferred by this instrument to the
PARTY OF THE SECOND PART, or any portion thereof, shall at the
option of the PARTY OF THE FIRST PART revert to the PARTY OF THE
FIRST PART sixty (60) days following the date upon which demand to
this effect is made in writing by the Civil Aeronautics Adminis-
trator or his successor in function, unless within said sixty (60)
days such default or violation shall have been cured and all such
terms, conditions, reservations and restrictions shall have been
met, observed or complied with, in which event said reversion shall
not occur and title, right of possession, and all other rights
transferred hereby, except such, if any, as shall have previously
reverted, shall remain vested in the PARTY OF THE SECOND PART, its
transferees, successors and assigns.

        (2)  That if the construction as covenants of any of the
foregoing reservations and restrictions recited herein as covenants
or the application of the same as covenants in any particular in-
stance is held invalid, the particular reservations or restrictions
in question shall be construed instead merely as conditions upon

the breach of which the Government may exercise its option to cause
the title, right of possession and all other rights transferred to
the PARTY OF THE SECOND PART, or any portion thereof, to revert to
it, and the application of such reservations or restrictions as
covenants in any other instance and the construction of the remain-
der of such reservations and restrictions as covenants shall not
be affected thereby.

TO HAVE AND TO HOLD the property transferred hereby, under
and subject to the aforesaid reservations, restrictions and conditions,
unto the said PARTY OF THE SECOND PART, its successors and assigns
forever.

IN WITNESS WHEREOF, the UNITED STATES OF AMERICA, acting
by and through the War Assets Administration, has caused these pre-
sents to be executed in its name and on its behalf by W.A. Rover,
District Director, War Assets Administration, and the CITY OF SANTA
MONICA, acting by and through its City Council, has caused these presents
to be executed in its name and on its behalf by R. M. DORTON, City Manager
and attested by _____K. O. GRUBB_____, its City Clerk, and
its seal to be hereunto affixed, all as of the _____10th_____ day of
_____August_____, 1948.

WITNESSES:

*Evelyn St. John*

*Martha E. Livingston*

WITNESSES:

*N. B. Kimberling*

*Eda N. Matthews*

ATTEST:

*K O Grubb*
City Clerk

UNITED STATES OF AMERICA
Acting by and through
WAR ASSETS ADMINISTRATION

By _____
District Director
Los Angeles District Office

CITY OF SANTA MONICA
STATE OF CALIFORNIA

By _____
CITY MANAGER

-7-

## SCHEDULE "A"

| SWPA NO.P-L | ITEM | UNITS | QUANTITY |
|---|---|---|---|
| 2661568-1-1 | Ice Chest | ea. | 4 |
| "      1-2 | "    " | ea. | 1 |
| "      1-3 | Ice Box | ea. | 1 |
| 2661565-1-1 | Steel Drums | ea. | 2 |
| "      1-2 | "    " | ea. | 2 |
| "      1-3 | "    " | ea. | 1 |
| "      1-4 | "    " | ea. | 1 |
| "      1-5 | "    " | ea. | 3 |
| "      1-6 | "    " | ea. | 7 |
| "      1-7 | "    " | ea. | 3 |
| "      1-8 | "    " | ea. | 1 |
| 2661567-1-1 | Fire Extinguisher | ea. | 4 |
| "      1-2 | "    " | ea. | 10 |
| "      1-3 | "    " | ea. | 4 |
| "      1-4 | "    " | ea. | 12 |
| 2661569-1-1 | Wire Camouflage | ea. | 10 |
| 2661570-1-1 | Hose Fibre Fire w/nozzle | ea. | 2 |
| "      1-2 | "    "    " | ea. | 4 |
| "      1-3 | "    "    " | ea. | 2 |
| 2661566-1-1 | Oak Barrel | ea. | 1 |
| 2661571-1-1 | Ping Pong Table | ea. | 1 |
| 8009-5711 | | | |
| WAA-21 #5 | Truck fire, pumper | | |
| 2657337-3-4 | | | |
| WAA-21 #6 | Tractor, International, Mod.TDR 18 Bulldozer | | |
| 2657337-4-4 | | | |
| WAA-21 #3 | Tractor, Fordson | | |
| 2657342-3-3 | | | |
| WAA-21 #4 | Grader, Motorized, J.D. Adams Mod. 201 | | |
| 2657342-2-1 | | | |
| WAA-21 #10 | Crane, Tractor, Hughes-Keenan, Model MC2R | | |
| 8009-11123-1-1 | | | |
| RP-1 | Truck, Fire & Rescue, International | | |

STATE OF CALIFORNIA )
                    )  SS
COUNTY OF LOS ANGELES )

On this 19th day of August, 1948, before me Helen P Peralta, a Notary Public in and for the County of Los Angeles, State of California, personally appeared Walter A. Rover, known to me to be the District Director, Los Angeles District Office, War Assets Administration, and known to me to be the person who executed the within instrument on behalf of the War Assets Administration which executed said instrument on behalf of the United States of America and acknowledged to me that he subscribed to the said instrument the name of the United States of America and the name of the War Assets Administration on behalf of the United States of America, and further that the United States of America executed said instrument.

WITNESS my hand and official seal.

Notary Public in and for said
County and State

My Commission expires

My Commission Expires Apr. 23, 1949

(4-12-48)

## C E R T I F I C A T E

I, the undersigned ___L. S. WRIGHT, Secretary___

___The General Board___ ___War Assets Administration,___ in my

official capacity as such _____Secretary_____

and duly authorized in the DELEGATION OF AUTHORITY INCIDENT TO THE CARE,

HANDLING AND CONVEYANCING dated ___Apr. 9, 1948___ , to make the following

certification, do hereby certify:

1. That ___Walter A. Rover___ is the

___District Director, Los Angeles District Office___

_____

War Assets Administration, duly appointed, authorized and acting in such

capacity at the time of the execution of the attached instrument.

2. That the attached DELEGATION OF AUTHORITY INCIDENT TO THE

CARE, HANDLING AND CONVEYANCING is a true and correct copy of the original

of said DELEGATION OF AUTHORITY, dated ___Apr. 9, 1948___

Given under my hand this ___10th___ day of ___August___, 1948.

___[signature]___

Secretary
(Title)
The General Board
(Office)
War Assets Administration

*deed "4*

(NOTICE)

DELEGATION OF AUTHORITY NO. 143

### DELEGATION OF AUTHORITY INCIDENT TO THE CARE, HANDLING, AND CONVEYANCING OF SURPLUS REAL PROPERTY AND PERSONAL PROPERTY ASSIGNED FOR DISPOSAL THEREWITH

The Deputy Administrator, Office of Real Property Disposal, and each Associate Deputy Administrator, Office of Real Property Disposal, War Assets Administration; the Regional Director, the Deputy Regional Director for Real Property Disposal, the Associate Deputy Regional Director for Real Property Disposal, and the Assistant Deputy Regional Director for Real Property Disposal, in each and every War Assets Administration Regional Office; the District Director and Deputy District Director for Real Property Disposal, in each and every War Assets Administration District Office, and any person or persons designated to act, and acting, in any of the foregoing capacities, are hereby authorized, individually (1) to execute, acknowledge and deliver any deed, lease, permit, contract, receipt, bill of sale, or other instruments in writing in connection with the care, handling and disposal of surplus real property, or personal property assigned for disposition with real property, located within the United States, its territories and possessions, (2) to accept any notes, bonds, mortgages, deeds of trust or other security instruments taken as consideration in whole or in part for the disposition of such surplus real or personal property, and to do all acts necessary or proper to release and discharge any such instrument or any lien created by such instrument or otherwise created, and (3) to do or perform any other act necessary to effect the transfer of title to any such surplus real or personal property located as above provided; all pursuant to the provisions of the Surplus Property Act of 1944, as amended, (58 Stat. 765; 50 U.S.C. App. Supp. 1611); Public Law 181, 79th Cong. (59 Stat. 533; 50 U.S.C. App. Supp. 1614a, 1614b); Reorganization Plan 1 of 1947 (12 F.R.4534); Public Law 289, 80th Cong. (61 Stat. 678); and War Assets Administration Regulation No. 1 (12 F. R. 6661), as amended.

The Regional Director in each and every War Assets Administration Regional Office is hereby authorized to redelegate to such person or persons as he may designate the authority delegated to him by this instrument.

L. S. Wright, the Secretary of The General Board and Robert Whittet, Associate Deputy Administrator, Office of Real Property Disposal, War Assets Administration, are hereby authorized, individually, to certify true copies of this Delegation and provide such further certification as may be necessary to effectuate the intent of this Delegation in form for recording in any jurisdiction, as may be required.

This Delegation shall be effective as of the opening of business on April 9 _____, 1948.

This authority is in addition to delegations of authority previously granted under dates of May 17, 1946; May 29, 1946; July 30, 1946; September 16, 1946; October 31, 1946; November 22, 1946; January 13, 1947; June 6, 1947; and December 1, 1947; but shall not in any manner supersede provisions of said delegations as do not conflict with the provisions of this Delegation.

*JESS LARSON*

JESS LARSON
Administrator

Dated:   APR 9 _____, 1948.

A RESOLUTION OF THE CITY COUNCIL OF THE
CITY OF SANTA MONICA ACCEPTING AN INSTRU-
MENT OF TRANSFER FROM THE UNITED STATES
OF AMERICA.

THE CITY COUNCIL OF THE CITY OF SANTA MONICA DOES RESOLVE AS
FOLLOWS:

SECTION 1.   That that certain instrument of transfer from
the United States of America, acting by and through the War Assets
Administration, whereby said United States of America does surrender
to the City of Santa Monica the former's lease-hold interest in
and to the premises known as Cloverfield Santa Monica Municipal Air-
port and certain easements and temporary rights of way appurtenant
thereto, be and the same hereby is accepted.

SECTION 2.   That the City Manager hereby is authorized
to execute said instrument of transfer on behalf of the city and
the City Clerk shall attest his signature thereto.

SECTION 3.   That the City Clerk shall certify to the adop-
tion of this resolution and thenceforth and thereafter the same
shall be in full force and effect.

ADOPTED and APPROVED this 10th day of   August  , 1948.

ATTEST:

_____                    _____
City Clerk                                           Mayor

I hereby certify that the foregoing resolution was duly
adopted by the City Council of the City of Santa Monica at a
regular meeting thereof held on the  10th  day of  August  ,
1948, by the following vote of the Council:

AYES:     Councilmen: Barnard, Querico, Markworth, Neilson,
                                    Talmage, Schimmer
NOES:     Councilmen: None
ABSENT:   Councilmen: Gates

_____
City Clerk

Approved as to form this
10   day of August  , 1948.

ROYAL M. SORENSEN
Royal M. Sorensen, City Attorney

# Exhibit 4

ΝTRACT NO. 4069(CCS)

## SANTA MONICA AIRPORT AGREEMENT

Section 1. **Purpose.**

This Agreement resolves a series of disputes involving the Santa Monica Airport (hereinafter "the Airport"). These disputes have taken various forms, including extensive complex litigation. In addition to expressing the mutual consent of the parties, including the City of Santa Monica (hereinafter "the City") and the Federal Aviation Administration hereinafter ("the FAA"), this Agreement responds to the concerns of local and national aviation interests and residents of neighborhoods affected by noise from the Airport.

The various Airport disputes have occurred over an extended period of time and have involved a number of specific issues. In these disputes there have been two common factors:

a. The impact on the community surrounding the Airport of noise from aircraft operating into and out of the Airport.

b. Various restrictions and limitations imposed by the City on the users of the Airport, and the effect of these restrictions on air traffic in the Los Angeles Metropolitan Region.

By this Agreement the parties indicate their willingness to approach the many varied Airport issues systematically and cooperatively. This Agreement describes

the specific points of agreement between the parties and provides a format within which issues arising in the future can be addressed and resolved. A fundamental purpose of this Agreement is to expand and improve the communication, cooperation, and mutual understanding of the various perspectives of the parties, while recognizing and preserving their respective legal rights.

Section 2. <u>Basis for Agreement</u>.

This Agreement was reached only after and is the result of extensive study and analysis of the many different issues involving the Airport. The parties have had numerous meetings and extensive detailed discussions concerning the points which form the terms of this Agreement. There has been extensive involvement of Airport users and neighbors, including several public hearings and the participation of an Airport Working Group composed of representatives of a broad spectrum of interests and perspectives.

a. <u>Recognition of Legal Principles</u>.

This Agreement is based on a recognition of the legal rights and duties of the parties, a balancing of interests, and an awareness of facts indicating a resolution of conflict is practicable.

Three underlying legal principles are the basis for this Agreement:

(i) The Airport is to be open and available to and for public use as an airport on fair and reasonable terms,

2

without unjust discrimination, and without granting any exclusive rights prohibited by law.

(ii) Pursuant to the Federal Aviation Act of 1958, as amended, exclusive authority is vested in the FAA for the regulation of all aspects of air safety, the management and control of the safe and efficient use of the navigable airspace, and movement of aircraft through that airspace. Under Section 611 of that Act the FAA also has substantial responsibility for the reduction of aircraft noise.

(iii) The City has the responsibility to manage the Airport, including the ability to take reasonable action designed to abate the impact of noise from aircraft operations on surrounding communities, in accordance with the principles of Santa Monica Airport Association v. City of Santa Monica, 479 F.Supp. 927 (C.D. Cal. 1979), affirmed, 659 F.2d 100 (9th Cir. 1980); and British Airways Board v. Port Authority of New York, 558 F.2d 75 (2d Cir. 1977).

b.  Balancing of Factors.

The fundamental basis for this Agreement involves the balancing of a number of diverse factors.  Studies and analysis have demonstrated and it is agreed that:

(i) The Airport serves an important role in the regional and national system of air transportation and air commerce.  It has a vital and critical role in its function as a general aviation reliever for the primary airports in the area.  As a reliever facility the Airport attracts and provides service to general aviation thereby diverting

3

aircraft away from the air carrier airports and other heavily used airports located in the Greater Los Angeles Area. Study and analysis have confirmed this congestion and that other similar general aviation reliever airports in the area are already heavily used and do not have the ability to accept or absorb the service provided by Santa Monica Airport.

(ii) The Airport is bounded on three sides by densely populated residential areas. Noise from aircraft departing from and landing at the Airport, including those operating within the Airport flight pattern, can have an impact on the quality of life of citizens of Santa Monica and Los Angeles. Many residents in these areas have long complained to the City over the impact of aircraft noise and demanded that the City take effective action with respect to aircraft noise.

c. Factors Leading to Agreement.

Three factors were critical to the achievement of this Agreement:

(i) The willingness of the parties to approach the Airport issues with an open mind and to consider imaginative and previously untried alternative concepts, with recognition of the legitimacy and validity of the interests and concerns of other parties. This good faith effort to explore and consider many different alternatives was critical in achieving compromises designed to balance the many factors involved.

4

(ii) The recognition that the Airport is poorly designed and organized. Consequently it is agreed that the Airport can be redesigned so as to maintain the current level, quantity, and type of services provided by the Airport and to provide "residual" land which could be made available to the City for other uses compatible with Airport operations.

(iii) The recognition that any noise problem at the Airport can be addressed through a noise mitigation program focused on a cooperative effort to reduce noise levels of aircraft using the Airport, by careful design of Airport facilities and ground buffers, and by sensitive placement of flight paths to achieve noise abatement consistent with safety.

Section 3.  Scope and Duration.

This Agreement states the principles and plans for the operation of the Airport. All prior agreements between the parties concerning the Airport, and all actions of the parties during the duration of this Agreement, shall be interpreted consistently with this Agreement. This Agreement shall be effective from the date of its execution until July 1, 2015.

Section 4.  Settlement of Legal Disputes.

This Agreement serves to resolve all existing legal disputes among the parties. In this context it constitutes a settlement Agreement applicable to all existing litigation

5

and/or administrative complaints pending between the parties. Following its acceptance and execution by the parties, a copy may be filed with any Court or administrative body where any litigation or complaint is pending as evidence of the resolution and settlement agreed to by the parties.

Section 5.  Airport Layout Plan.

The parties are aware that the City approved an Airport Plan and Noise Mitigation Program for the Airport at the City Council Meeting of November 15, 1983.

The Airport Layout Plan submitted to and approved by the FAA on _____ JAN 31 1984 _____ (City Map No. SM0-11), is incorporated by reference into this Agreement and shall guide the development and improvement of the Airport for the duration of this Agreement. This Airport Layout Plan may be referred to herein as the "Airport Layout Plan."

The Airport Layout Plan shifts a substantial portion of aeronautical services from their present location on the south side of the Airport to the north side. Some aeronautical services will be maintained on the south side of the Airport. Additionally, the Airport Layout Plan makes available a substantial portion of the area located in the southeast section of the Airport, generally along Bundy Drive and Airport Avenue, and adjacent to Clover Park, for uses compatible with Airport operations. This would provide an expanded employment and revenue base and increased parkland for the City. The parties believe the Airport

6

Layout Plan and noise abatement program described in this Agreement provide a reasonable redesign of the Airport which balances aeronautical needs and community concerns.

Section 6.  Consent to Use of Land.

The FAA, as the successor to the Civil Aeronautics Administrator, approves the boundary of the Airport as shown in the Airport Layout Map, consents to the use of land designated as parkland and residual land therein for other than airport and aviation purposes, releases the City and this parkland and residual land from any and all conditions, covenants, and restrictions imposed by the Instrument of Transfer dated August 10, 1948, Deed No. 4 (CCS), and agrees that the City may develop such parkland and residual land in accordance with the terms of this Agreement, and in conformity with State and local planning law and noise compatibility standards.  However, such development shall not occur prior to the execution of leases with full-service fixed base operators in accordance with Section 14 of this Agreement.

Section 7.  Material Terms of Agreement.

The parties agree that certain points were specifically bargained for and constitute material terms of this Agreement.  These terms shall not be altered without the mutual consent of the parties, which shall not be unreasonably withheld.  The material terms of this Agreement include:

7

a. The City's obligation to operate the Airport for the duration of this Agreement (Section 8).

b. The runway/taxiway configuration as shown on the Airport Layout Plan (Sections 9 and 10).

c. Aircraft parking and tie-down space (Section 13).

d. Fixed base operator space (Section 14).

e. The 95 dB Single Event Noise Exposure Level maximum noise limit (Section 16).

f. The development of a tiered noise level system based on the performance capability of particular aircraft (Sections 17 and 18).

g. The process for implementation of the City's Noise Mitigation Program (Section 19).

h. The maintenance of the existing departure restriction (Section 22), the existing and possible future limitation on helicopter operations (Section 24), and the existing and possible future limitation on pattern flying (Section 25).

It is recognized and agreed to that the parties will cooperate with each other and rationally analyze issues as they arise, and that any term of this Agreement may be modified by the terms of any future agreements between the parties, provided such future agreements expressly indicate an intention to modify this Agreement.

It is agreed that any future grant agreements between the City and the FAA which are designed to implement the programs covered by this Agreement, defined as those

agreements for the federal funding of programs or improvements intended to further this Agreement executed prior to July 1, 1995, shall be consistent with this Agreement and shall not extend or alter the obligation of the City to operate the Airport under this Agreement, except as may be required by federal statute.

Section 8.  Commitment to Operate Airport.

The City will operate and maintain the Airport as a viable functioning facility without derogation of its role as a general aviation reliever airport as described in Section 2(b)(i) of this Agreement or its capacity in terms of runway length and width, taxiway system, and runway weight bearing strength until July 1, 2015.  The Airport will be capable of accommodating most kinds of general aviation aircraft, generally consistent with Group II Design Standards set forth in FAA Advisory Circular 150/5300.4B dated February 24, 1983.

The City agrees to improve the Airport physical layout as shown in the Airport Layout Plan and maintain the Airport and the facilities located on the Airport.

Section 9.  Runway/Taxiway Configuration.

At the present time the Santa Monica Airport has one runway designated 3/21 which is 5,000 feet long and 150 feet wide.  This runway will be continuously maintained in good operating condition by the City.  All presently installed air navigation facilities and Airport lighting systems

9

(*i.e.*, Air Traffic Control Tower, VOR, VASI, runway lights, etc.) will remain in their present location.  It is recognized that the VASI lights may be relocated if the landing threshold is displaced pursuant to Section 12.

Nothing in this Agreement prevents or precludes the replacement or upgrading of the present facilities and systems with new or technologically improved equipment, facilities or systems as necessary or appropriate.  At some future date new technology equipment such as a microwave landing system (MLS) may be installed; the City will be given priority for the installation of MLS equipment as it is developed and becomes available.

Section 10.  Runway Exit System.

The runway/taxiway system will be redesigned so as to establish designated angled exits from the runway, also known as high speed exits, in lieu of the present system. In addition, a centrally located area adjacent to the runway will be established, designated, and maintained to permit aircraft to exit the runway without using a designated taxiway.  Additional taxiway, Airport apron and aircraft parking facilities will be provided in accordance with the Airport Layout Plan.

Section 11.  Airspace Protection Criteria.

Standard FAA airspace protection criteria will be applied to maintain clear zones at the ends of the runway as shown in the Airport Layout Plan.  No construction will be

permitted laterally from the center line of the runway for the full length and on either side of the runway for a distance of 150 feet. That constitutes the edge of the safety area. From the edge of the runway safety area extending outward from the runway, structures will be permitted provided they meet the standard FAA 7 to 1 ratio (i.e. for every 7 feet of distance laterally there can be 1 foot of height added).

Section 12.   <u>Displaced Landing Threshold</u>.

The City has indicated a desire to modify the existing runway by displacing the threshold by 500 feet for airplanes landing at the Airport. There is some uncertainty regarding the effect of such an action in two areas: (1) whether this action would increase or decrease noise; (2) what effect, if any, there would be on air safety and the ability of the Airport to provide the level and type of service described in Sections 2(b)(i) and 8.

In order to analyze the potential effects of displacing the landing threshold by 500 feet, the parties agree to establish a trial program for a period not to exceed one (1) year during which the effects of displacing the landing threshold by 500 feet will be investigated.

A preliminary test will be conducted to determine if threshold displacement is likely to increase or decrease community noise impact. If it is determined that noise impact is likely to increase, no further testing will be performed and the landing threshold will not be displaced.

11

If it is not determined that noise impact is likely to increase, the landing threshold will be displaced for a period of up to one year, and the various effects of threshold displacement will be examined.

A final determination concerning this question of runway displacement will be made by the City after consultation with the FAA at the conclusion of this study based on the results of the study. This final determination can be made at any point in time within the designated one-year period. The parties agree to cooperate in the design and conduct of the tests and to consult concerning the data obtained. The full runway length of 5,000 feet will be available at all times for takeoff and will be available for use by landing airplanes in an emergency situation.

Section 13. **Aircraft Parking Space and Fuel Service.**

The City will provide and maintain sufficient space to permit the parking or tie-down of at least 550 based aircraft and 40 transient aircraft. These aircraft tie-down or parking facilities for based aircraft will be allocated and made available by the City on reasonable terms to all Airport users including fixed base operators located on the Airport and individuals who wish to lease tie-down space from the City. Parking for transient aircraft will also be available on reasonable terms. In allocating this aircraft parking space the City will provide sufficient space to park aircraft of different types having different wing spans,

12

different lengths, and different power plants. The mix of aircraft to be accommodated at the Airport shall be consistent with the present mix of aircraft now based at the Airport and the mix forecast for the future as shown in Chapter III of the Airport Master Plan Study dated October, 1983. Aircraft fuel service will be available at the Airport.

Section 14. <u>Fixed Base Operators</u>.

The City will provide sufficient space for the location and operation of three (3) full service fixed base operators (FBO). The City will lease to each full service FBO sufficient space to provide a full range of aeronautical services including but not limited to: aircraft and avionics sales; aircraft and avionics maintenance, service and repair facilities; flight school and training service; and charter and air taxi service. It is recognized that the needs of each FBO may be different in terms of total space or acreage required. FBO leases will be consistent with the terms of this Agreement and contingent on compliance with the City's non-discriminatory policies and regulations. The City will provide access to sufficient space at reasonable rental rates to enable each FBO to conduct a viable business, including space for an office structure, training facilities, aircraft and automobile parking and an aircraft maintenance hangar.

In addition, the City will provide sufficient space for the location and operation of limited or specialized

13

fixed base operators.  It is recognized that these FBOs do not require as much space as a full service FBO since they generally provide limited aeronautical service (e.g., avionics maintenance, repair or installation; airplane propeller repair, maintenance or installation).

In order to permit all FBOs, whether full service or engaged in specialized aeronautical activity, to conduct their business activity on a reasonable basis, the City will lease sufficient space to them consistent with the approved Airport Layout Plan on fair and reasonable terms on a financial basis comparable to those used at other similar airports in the region for a sufficient term of years to enable them to amortize their costs and have the opportunity to make a profit.

The parties recognize and agree that it is appropriate for the City to exercise its proprietary authority to adopt ordinances and regulations applicable to lessees and users of the Airport consistent with the terms of this Agreement.

Section 15.   Noise Abatement Principles.

The parties recognize and acknowledge that the achievement of the abatement of aircraft noise to the extent technologically practicable and consonant with air safety is consistent with the function, role, and service provided by the Airport.  To this end the parties agree to cooperate and work toward the abatement of aircraft noise by the following described methods.

14

The parties are aware that the City has adopted a Noise Mitigation Program as an integral part of its Airport Plan. The City's Noise Mitigation Program is intended to abate aircraft noise to the extent technologically practicable and consonant with air safety, and to meet a noise reduction goal equivalent to an approximate 4 dB reduction in the Community Noise Equivalence Level (CNEL) from the 1982 levels attributable to aircraft noise. Within the framework of and consistent with the material terms of this Agreement, the City expects to meet this noise goal by the application of the material terms and concepts set out in this Agreement. The parties agree that progress toward achieving noise reduction goals through implementation of the Noise Mitigation Program will be carefully studied and analyzed. Alternative measures to abate noise consistent with this Agreement will be evaluated for their effectiveness in reducing noise, effect on air safety and air traffic, and effect on the utility of the Airport.

Section 16.   Maximum SENEL Limit.

The current SENEL aircraft noise limit of 100 dB as measured at the existing noise monitoring sites established by the City will be established and maintained at 95 dB. The parties believe that substantially all of the currently based or transient aircraft which have used the Airport in recent years can be operated safely using safe noise abatement operating procedures and meet this reduced SENEL limitation.

15

## Section 17.   Performance Based Noise Limit.

The parties believe that many of the aircraft using the Airport can be operated more quietly using safe noise abatement flight operating procedures.   Consequently the parties agree to cooperate in the development of a program designed to establish tiered noise levels for different types or kinds of aircraft (rather than a single specified maximum noise level limit) to encourage all aircraft operators to use safe noise abatement operating procedures in order to minimize the noise impact of their aircraft use.

The parties believe this performance-based noise reduction program is capable of resulting in reduced Community Noise Equivalence Level (CNEL) from the operation of aircraft.   The expectation of achieving such noise reduction is based on the City's analysis of actual measured aircraft flights at the Airport.   The actual results to be obtained from implementation of a performance-based noise program will depend on various factors, including the degree to which all Airport users and governmental entities cooperate in implementing and complying with procedures and practices established pursuant to this Agreement.

## Section 18.   Experimental Nature of Noise Program.

The parties recognize and acknowledge that the concept of tiered noise level limits based on the demonstrated noise performance capabilities of different types and kinds of aircraft is unique.   Application of this concept has, to the knowledge of the parties, never been attempted prior to this

16

time anywhere; it will require the difficult task of establishing a valid and reliable data base for analysis and classification. Its application also requires creating a classification system which identifies the performance based noise levels for the wide range of diverse aircraft types operating at this Airport as well as the process of placing particular individual aircraft in a particular noise performance category for this Airport.

While the parties believe this tiered concept reasonably applied can work, they also acknowledge that it is experimental in nature. The parties agree to work cooperatively to develop this program. To this end the City agrees to provide to the FAA the data developed by and during this program. The FAA agrees to provide technical assistance to the City including but not limited to review of the data provided, review of any data analysis obtained by the City, and the FAA may conduct and make available to the City its own analysis of the data collected. The FAA will make its Integrated Noise Model Computer Program available to the City.

Section 19. <u>Implementation of</u>
<u>Noise Abatement Program.</u>

The parties agree that the process of implementing the noise abatement program should proceed in stages, with regular measuring and analysis, full communication and cooperation, and adjustment as analysis progresses. This

17

process will generally comprise four (4) phases, to be implemented as follows:

a. **Commencement of Program.**

Upon execution of this Agreement, the City will commence implementation of the noise abatement program. The first implementation phase will include: the adoption of regulations instituting the noise abatement program; the establishment of a system to promote communications and voluntary compliance; the definition of the terms of scientific analyses and experiments to be performed; the gathering of data using the City's existing noise monitoring equipment; and the design, procurement, and installation of new noise equipment necessary to conduct the full program.

b. **Experimental Test Period.**

Commencing from the date the new noise equipment is operational, there will be a one-year test period wherein appropriate operating procedures and categorical noise limits are developed and analyzed, and the effect of other noise mitigation measures and factors is evaluated. At the conclusion of this experimental period, the regulations would be adjusted in accordance with the results of the study.

c. **Evaluation Test Period.**

After adjustments have been made to the program in light of the results of the Experimental Test Period, there will be a one-year period in which the noise abatement program as adjusted is evaluated in order to determine

18

progress toward achievement of the City's Noise Goal.   There
will also be a periodic evaluation of the program by all
parties in terms of its relationship to and measurement of
progress toward achievement of noise abatement generally and
aviation noise as a specific contributor to community noise.
Included in this review will be an analysis of the extent to
which the ability of the City to achieve its noise reduction
goals is affected by noise sources other than aircraft
noise.

    d.   <u>Adjustment of Program</u>.

    The results of the Evaluation Test Period will be
analyzed by the parties.   If the City's noise goal is not
met and analysis indicates that aircraft noise exceeds noise
from other sources in the community, the City will analyze
alternative noise mitigation measures designed to assist in
the achievement of the City's aircraft noise reduction goal,
including possible regulations intended to reduce aircraft
noise attributable to the volume of pattern flying.   That
analysis will consider the effect of these alternative
measures in terms of both noise abatement results expected
and the role, function, and service provided by the Airport.
Before the City implements any such alternative measures, it
will consult with the FAA and other interested parties, it
being explicitly agreed, however, that no material terms of
this Agreement can be amended or modified without the
agreement of the parties to this Agreement.

Section 20.  <u>Enforcement During Implementation</u>.

The noise abatement program will emphasize pilot education and communication with individual pilots regarding effective and safe noise abatement operating procedures. The cooperation and advice of pilots, FBOs, and interested members of aviation and neighborhood communities will be sought.

The 95 dB maximum SENEL limit will be enforced by the City using civil sanctions varying according to the willfulness, severity, and frequency of violations. With respect to pilots who repeatedly operate an aircraft in violation of this limit, the City may after investigation to assure that a violation was not related to extraneous factors beyond the pilot's control such as loss of power, action to avoid other aircraft, or unusual weather conditions, take actions such as formal warning, imposition of civil penalties, or, after informing the FAA, exclusion from the Airport.

The parties recognize that certain types of aircraft are estimated to be unable to meet the 95 dB maximum limit under any condition or procedure. Operators of such aircraft, upon violation of maximum noise limits, may be requested not to return to the Airport. If such aircraft do return and violate the noise limits after such request, they may be excluded from the Airport through formal administrative action. It is recognized that disobedience

of a formal City administrative action is subject to additional sanctions.

During the initial implementation phase described in Section 19(a), the City will establish two performance-based noise limits at 95 dB and 90 dB, based on initial noise measurements and data analysis. During the second phase of the noise abatement program described in Section 19(b), aircraft will be placed into particular noise limit categories based on the demonstrated noise performance history of that aircraft and advice provided to the City by its consultants, the FAA, and users of the Airport. It is expected that noise categories will be initially established at 95 dB, 90 dB, and 87 dB, consistent with the measurements and analysis performed in conjunction with the noise abatement program.

The parties expressly recognize that there is a need to collect a substantial amount of additional data on all types of aircraft which operate at the Airport. When that data base is developed the parties recognize that additional or different categories may be created as well as the identification and placement of various specific aircraft into a particular category, or the adjustment of the noise level categories.

During the phases of this program described in Section 19, the FAA will, in cooperation with the City and any other interested person or persons, make reasonable efforts to educate, inform, and counsel pilots in terms of how to

21

operate their aircraft so as to eliminate unnecessary noise in the communities adjacent to the Airport.  Similarly, during the implementation phases of this program described in Sections 19(a), (b), and (c), the City will not take formal administrative action against pilots who operate their aircraft to or from the Airport in a manner which exceeds either the 90 dB or 87 dB SENEL limit but does not exceed the maximum 95 db SENEL limit.

Section 21.  <u>Cooperation in Enforcement</u>.

The City and the FAA acknowledge and agree that vis-a-vis third parties each of them is responsible for the enforcement of their own respective regulations and that neither of them has any responsibility for or authority to enforce any regulations established by the other.  However, both the City and the FAA recognize that it is in their mutual interest to cooperate and exchange relevant information necessary to the successful implementation of this Agreement.

Section 22.  <u>Night Departure Restriction</u>

The parties recognize that the City has established a prohibition on takeoffs from the Airport between 11:00 p.m. and 7:00 a.m. on Monday through Friday, and between 11:00 p.m. and 8:00 a.m. on Saturday and Sunday.  This prohibition is not applicable in emergency situations.  This regulation is included as a material term of this Agreement and is expected to remain in effect.  It is agreed that it will not

be amended or modified without the prior agreement of the parties.

Section 23.  Golf Course Turn.

As a noise abatement measure FAA will establish a standard departure procedure for runway 21 which will route aircraft approximately 10 degrees south of the present runway alignment routing so as to route air traffic over the golf course area.  Additionally, FAA will study the possibility of establishing an offset localizer approach to runway 21.  If approved by the City and installed the offset localizer would be an interim measure until a microwave landing system can be installed at the Airport.  Before establishing such an offset localizer approach FAA will analyze and advise the City of what effect, if any, that facility would have in terms of providing some noise abatement.

The effect of the Golf Course Turn on aircraft noise impact in Santa Monica and Los Angeles neighborhoods will be analyzed during the implementation of the noise abatement program.

Section 24.  Helicopters.

The parties recognize that noise from helicopters can have an impact on residential communities around the Airport, including neighborhoods that are not significantly affected by noise from fixed-wing aircraft.  The parties agree to develop and implement a designated helicopter

23

landing area, a preferred helicopter flight path, and a helicopter flight altitude that provides maximum noise abatement consistent with safety.

The parties recognize that helicopters are an important part of the general aviation fleet, and are used for military, law enforcement and medical purposes, and will be permitted to use the Airport consistent with noise regulations.

The parties agree that the current ban on helicopter pattern flying will remain in effect.

The parties recognize that the Airport is not currently used as a base for helicopter sales, training or maintenance. The parties agree that helicopter noise will be evaluated as part of the noise abatement program study. Dependent on the results of that study the City may, after consultation with the parties, deny access to the Airport to an FBO, a substantial portion of whose activity involves helicopter operations. During the pendency of that study, the City is not required to lease space on the Airport to an FBO, a substantial portion of whose activity involves helicopter operations.

Section 25.   Pattern Flying Restrictions

The parties recognize that the City has established a prohibition on touch-and-go or stop-and-go operations at the Airport after sunset and before 7:00 a.m. on Monday through Friday as well as all day on Saturday, Sunday, and legal holidays.

This restriction is expected to remain in effect pending the results of the noise abatement study described in Section 19. The parties agree that the pattern flying restriction described above may be modified by the City, after consultation with the FAA, following the completion and based on the results of the noise abatement study.

Section 26.   Design for Noise Abatement.

The Airport Layout Plan includes several design features intended to provide mitigation of aircraft noise. These include designated engine run-up areas and noise buffers to mitigate ground noise, designated helicopter operation areas, and the establishment of a touch-and-go line.  Structures constructed under the Airport Plan will be designed to assist in mitigating noise impacts.

Section 27.   Analysis of Future Alternatives.

The parties recognize and acknowledge that there may be other feasible noise abatement actions possible but not described in this Agreement. Programs to acquire homes and resell them with easements or to provide insulation of buildings may provide additional means to achieve the City's noise abatement goals.  New or improved flight operating techniques or aircraft modification technology may be developed.  The parties agree to keep each other informed of progress in the area of noise abatement technology and techniques which become available as means of reducing the impact of aircraft noise on the community.

25

Section 28.   <u>Federal Funding</u>.

The parties recognize and acknowledge that the accomplishment of the program described in this Agreement, including but not limited to the redesign of the Airport and the implementation of the noise abatement program will require the expenditure of funds.  The FAA agrees that it will, consistent with this Agreement and its nationwide program, provide financial assistance to the City for those Airport projects eligible for such assistance pursuant to the Airport and Airway Improvement Act of 1982 and other funding sources, and will accord the City a high priority for such financial assistance.  These funds will be made available for many different purposes including Airport planning, Airport improvement, and Airport noise abatement projects consistent with the terms of this Agreement.

Section 29.   <u>Commitment to Future Cooperation</u>.

The parties anticipate that from time to time in the future this Agreement may be supplemented and/or modified in order to accomplish its purposes.  The parties agree to work cooperatively and consult with each other and other interested persons to resolve any differences between them which may arise in the future and in particular to work cooperatively and consult with each other with respect to implementation of the tiered noise level concept based on demonstrated aircraft noise performance classification as well as any other proposal designed to effect noise abatement at the Airport.

IN WITNESS WHEREOF, the parties ~~ve caused this Agreement to be executed this 31st day of January, 1984.

CITY OF SANTA MONICA,
a municipal corporation

By _____
JOHN H. ALSCHULER, JR.
City Manager

APPROVED AS TO FORM:

_____
ROBERT M. MYERS
**City Attorney**

FEDERAL AVIATION ADMINISTRATION

By _____
MICHAEL J. FENELLO
Deputy Administrator

By _____
HOMER C. McCLURE
Director, Western Region

27

# Exhibit 5

# SETTLEMENT AGREEMENT/CONSENT DECREE BETWEEN THE FEDERAL AVIATION ADMINISTRATION AND THE CITY OF SANTA MONICA

The United States of America, acting through the Federal Aviation Administration (FAA) and the City of Santa Monica, CA (City) (collectively, the Parties) enter into this Settlement Agreement (Agreement), by and through their undersigned representatives, to resolve the disputes outlined below and pertaining to the operation of the Santa Monica Municipal Airport (Airport or SMO). This Agreement, once signed by the FAA and the City, shall be presented to the U.S. District Court for the Central District Court of California (U.S. District Court) for entry as a Consent Decree.

## Background

### Airport Property & Runway

SMO is generally composed of two parcels of property.

1. *First Parcel.* The first parcel consists of approximately one hundred and seventy acres that the City of Santa Monica (City) leased to the U.S. government during World War II. (This parcel is referred to herein as the First Parcel and is more fully described as the premises referred to as "Clover Field, Santa Monica Municipal Airport" in the leases, as modified, that are referred to in that certain Instrument of Transfer, dated as of August 10, 1948, between the United States of America and the City that was recorded at Book 28055, Pages 211 through 222, inclusive, in the Official Records of Los Angeles County, California (the IOT).)

2. *Second Parcel.* The second parcel consists of approximately eighteen acres with respect to which the United States of America duly executed a Quitclaim Deed dated April 8, 1949, and recorded at Book 30037, Pages 364 though 370, inclusive, in the Official Records of Los Angeles County, California (the Quitclaim Deed), conveying its interests in said parcel to the City. (This parcel is referred to herein as the Second Parcel.) (The First Parcel and the Second Parcel, together with any other right, title and interest in any premises, structures, improvements or other property conveyed by the United States of America to the City in the IOT or the Quitclaim Deed, are collectively referred to herein as Airport Property).

*Airport Runway.* The Airport's current runway of 4,973 feet occupies land in both the First Parcel and Second Parcel, and also includes adjoining land that the Douglas Aircraft Company conveyed to the City by grant deed in 1945.

**District Court Litigation**

On August 10, 1948, pursuant to the Surplus Property Act of 1944 (SPA), the U.S. Government and the City executed an "Instrument of Transfer" (IOT) by which the U.S. Government surrendered its leaseholds and which the U.S. Government contends imposed certain restrictions on the future use of the Airport property including that:

> the land, buildings, structures, improvement and equipment in which this instrument transfers any interest shall be used for public airport purposes for the use and benefit of the public, on reasonable terms and with unjust discrimination and without grant or exercise of any exclusive right . . . .

The IOT further provides that "the restrictions . . . shall run with the land . . . ." and requires that:

> the entire landing area . . . be maintained for the use and benefit of the public at all times in good and serviceable conditions, provided, however, that such maintenance shall be required as to structures, improvement, facilities and equipment only during the remainder of their estimated life . . . .

On April 8, 1949, the U.S. government effected a Quit Claim Deed, transferring its interests in all or substantially all of the Second Parcel to the City.

On October 31, 2013, the City sued the FAA under the Quiet Title Act regarding the meaning and effect of the IOT. *City of Santa Monica v. United States of America, et al.*, Case No. CV 13-08046 JFW (VBKx). The City's claim seeks, in part, a declaratory judgment providing that the City has unencumbered title to the Airport Property.

On February 13, 2014, the U.S. District Court dismissed the City's claim based on the statute of limitations. However, on March 11, 2016, the U.S. Court of Appeals for the Ninth Circuit reversed the District Court's dismissal and remanded the case to the District Court. Trial is currently set for August 29, 2017.

**Circuit Court Litigation**

On June 27, 1994, the City accepted a $1,604,700.00 federal grant for certain improvements at the Airport pursuant to the terms of a grant agreement that the Parties agree remained in effect for twenty years. On August 27, 2003, the City and the FAA executed a grant amendment that provided $240,500.00 in federal funds to the City. The Parties dispute whether the terms of the grant remain in effect for twenty years from the date of the acceptance of the amendment or for twenty years from the date of the acceptance of the initial agreement in which case they have expired.

In response to a complaint filed pursuant to 14 C.F.R. part 16, on August 15, 2016, the FAA issued a Final Agency Decision (FAD) holding that by accepting the additional funds, the grant expiration date was extended until August 27, 2023. *Nat'l Bus. Aviation Assoc., v. City of Santa Monica*, FAA Docket No. 16-14-04. The City sought review of the FAD in the U.S. Court of Appeals for the Ninth Circuit. *City of Santa Monica v. FAA*, Case No. 16-72827 (9th Cir.).

**Federal Administrative Proceedings**

The FAA issued a Notice of Investigation (NOI) to determine, in part, whether the City is violating its federal obligations to provide access to the fixed based operators (FBOs). *In re Compliance with Fed. Obligations by the City of Santa Monica*, FAA Docket No. 16-16-13. The NOI is based on the City's handling of the tenancy of the Airport's FBOs, the possible ban on the sale of unleaded fuels, and the City's declared intent to provide certain aeronautical services at SMO on an exclusive basis (proprietary exclusive). The City filed a response to the NOI asserting that it has fully complied with its obligations in regard to these matters.

On December 12, 2016, the FAA issued an Interim Cease and Desist order ordering the City to cease and desist from removing the FBO's until the FAA issues a final agency decision under the NOI. No final decision has been reached regarding the NOI.

**NOW, THEREFORE**, in consideration of the mutual covenants and other consideration described herein, the the Parties agree it is in the interest of the public and civil aviation to AGREE as follows:

I.    COMPLETE SETTLEMENT OF ALL CLAIMS

Within 30 days of this Agreement's execution, the Parties shall jointly move in *City of Santa Monica v. United States of America, et al.*, Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.), for entry of this Agreement as a Consent Decree and for a stay of the litigation pending the decision on the Consent Decree. Also within 30 days of this Agreement, the Parties shall jointly move to stay *City of Santa Monica v. Federal Aviation Administration*, No. 16-72827, (9th Cir.), pending the entry of the Consent Decree. Within 14 days of the entry of the Consent Decree, the City shall dismiss with prejudice *City of Santa Monica v. Federal Aviation Administration*, No. 16-72827, (9th Cir.). Furthermore, the Parties agree that entry of the Consent Decree shall resolve all pending disputes at issue in *In re Compliance with Federal Obligations by the City of Santa Monica*, FAA NO. 16-16-13 (U.S. Dep't of Transp., Fed. Aviation Admin.), and that the FAA shall therefore dismiss the NOI.

In addition, the FAA shall send a letter in substantially the form of Exhibit A to this Agreement to private parties that have filed Part 16 complaints raising issues within the scope of this Agreement requesting that the parties withdraw those complaints. The Parties acknowledge that the FAA does not have authority to require private parties to withdraw their Part 16 complaints

and that the FAA must consider any complaints not withdrawn.  Thus, the Parties further acknowledge that no action of a private party in a Part 16 proceeding can constitute a breach of this Agreement.

Unless modified by the court having jurisdiction over the Consent Decree, the Decree shall expire on December 31, 2028.  The Parties agree that the expiration of the Decree shall have no effect on the terms or condition of this Agreement, which terms or conditions shall survive the expiration of the Decree.

Further, the Parties agree that this Agreement upon entry of the Consent Decree shall resolve all claims by the Parties that have been brought, or could have been brought, in *City of Santa Monica v. United States of America, et al.* Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.), *City of Santa Monica v. Federal Aviation Administration*, No. 16-72827, (9th Cir.), or *In re Compliance with Federal Obligations by the City of Santa Monica*, FAA NO. 16-16-13 (U.S. Dep't of Transp., Fed. Aviation Admin.), including all the Parties' actual or potential claims pertaining to the past operation of the Airport by the City pertaining to tenants, non-tenant aircraft and FBOs.

If one of the Parties alleges a breach of the terms or conditions of this Agreement, the exclusive venue for remedying such a breach shall be the court having jurisdiction over the Consent Decree.

In the event the court in *City of Santa Monica v. United States of America, et al.,* Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.) does not enter the Consent Drecree as-written, the Parties shall confer and, as soon as feasible, decide whether to move the court to enter a modified Consent Decree.  If the Parties have not reached an agreement on the form of the revised Consent Decree within 30 days, the Parties shall jointly move to lift the stays of litigation in *City of Santa Monica v. United States of America, et al.,* Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.) and *City of Santa Monica v. Federal Aviation Administration*, No. 16-72827, (9th Cir.).  The FAA shall also at that time resume proceedings in *In re Compliance with Federal Obligations by the City of Santa Monica*, FAA NO. 16-16-13 (U.S. Dep't of Transp., Fed. Aviation Admin.).  In such event each Party agrees that this Agreement shall be of no force and effect and may not be used by either Party for any purpose whatsoever.

## II.  RUNWAY

A.     Runway Length.  The Parties agree that the Airport's runway shall have an operational runway length of 3,500 feet.  The 3,500 foot distance shall not include the runway safety areas that shall be constructed and maintained at both runway ends.  The runway safety area may include an engineered materials arrestor system (EMAS) at the City's option.  The Parties further agree that the Airport shall accomodate aircraft operations that can safely take off

and land on a runway of the agreed-on length. Prior to the initiation of shortening the runway, the City shall comply with the 30 day notice provisions of 14 C.F.R. Part 157.5(b)(2).

**B.      Costs to Shorten the Runway.**  The costs to shorten the runway, including but not limited to the installation of EMAS, shall be borne by the City.  If sought by the City, the FAA will provide technical support to the City through the FAA's Office of Airports to assist in obtaining federal funds to support the shortening of the runway, as consistent with federal laws, regulations and the availability of funds.

**C.      Environmental Studies.**  The City shall be responsible for complying with its state and federal environmental requirements related to its planning and implementation of modifications at SMO.  The City's responsibility shall include the cost of conducting any necessary environmental studies or other requirements under the National Environmental Policy Act (NEPA). 42 U.S.C. § 4321 *et seq.*

## III.  USE AND RELEASE OF PROPERTY

Consistent with the ultimate configuration of the runway pursuant to Section II, the FAA agrees that prior to closure of the Airport, the City may use the property no longer needed for the the Airport with a shortened or reconfigured runway, taking into consideration standard safety areas, including the use of EMAS, for non-aeronautical uses that are safe and compatible with the operation of the Airport.  Such land shall be subject to an avigation easement for the period the airport is operated which shall be recorded contemporaneously with any instrument releasing such property. A copy of the form of avigation easement is attached hereto as Exhibit B.  This agreement does not constitute FAA approval of any particular future use.

## IV.  CITY'S PROPRIETARY EXCLUSIVE RIGHT

### A.  FAA's Acknowledgement of the City's Right

The City may exercise its proprietary exclusive right to provide aeronautical services at SMO, including but not limited to the sale and into-plane delivery of all types of aviation fuels, in accordance with generally-applicable rules governing the exercise of proprietary exclusive rights.

### B.  City's Obligations

The City shall provide any proprietary exclusive aeronautical services at SMO (i) in conformance with the standard of grant assurance 22 (ii) on reasonable terms at reasonable rates, and (iii) during all hours that such services would normally be provided at comparable general aviation airports taking into account permissible curfews provided for in section V.  The City further agrees that, if the City does not fully provide a type of service at any point in time and a private FBO desires to provide such a service, that operator shall have reasonable access to the airport on commercially reasonable terms and in conformance with the standards of grant assurance 22. See 79 Fed. Reg. 18755 (April 3, 2014).

**C. Timing of the City's Exercise of Its Right**

Subject to the City's right pursuant to subsection D, below, the City will not implement any proprietary exclusive operations, as defined above, until the work to shorten the runway, as provided in Section II above, is complete.

**D. Leases for Private Aeronautical Service Providers Prior to the City's Exercise of Its Right**

Leases offered to all tenants providing aeronautical services shall be on reasonable terms and in substantially the same form as that attached as Exhibit C. For purposes of this Agreement, the phrase "reasonable terms" shall mean terms that are customary and usual at similarly situated and sized general aviation airports.

The City shall offer all current tenants providing aeronautical services leases of no less than three (3) years with reasonable terms appropriate to the aeronautical service usually and customarily provided such service at similar facilities, including but not limited to tenant investment and financing requirements.

The City shall also offer leases to all prospective tenants providing aeronautical services for which there is space at SMO subject to reasonable terms and consistent with the standards of grant assurance 22, provided the City is not itself providing such services on a proprietary exclusive basis.

Any and all leases providing aeronautical services may, at the City's election, be subject to termination upon six months written notice of the City's exercise of its proprietary exclusive right to provide the category of services otherwise being provided by private FBOs, provided the City is ready, willing, and able to fully provide such aeronautical service in accordance with applicable law.

**V.   AIRPORT CURFEW**

The City may submit an application for enhanced curfews consistent with 14 C.F.R. part 161 (Part 161). Review of such an application shall be conducted under the procedural rules and subject to the substantive standards applicable to all Part 161 applications submitted to the FAA, which shall not be affected by this Agreement. Review of any decision made in connection with such an application shall be conducted exclusively in the same manner as, and in the same forum as, review of any decision made in connection with a Part 161 application submitted to the FAA. That is, this Agreement shall not affect the form or substance of such a review. Notwithstanding any other provision of this Agreement, judicial review of FAA's decision and record thereof with regard to any Part 161 application submitted by the City shall be within the exclusive jurisidiction of the applicable U.S. Court of Appeals.

## VI.    DURATION

The City agrees to operate the Airport consistent with its obligations set forth in this Agreement until December 31, 2028, unless an earlier date is agreed to by the Parties. Any subsequent decison by the FAA to release the Airport at an earlier date shall be made consistent with the standard of 49 U.S.C. § 47153. The obligation to operate the Airport until December 31, 2028 shall be binding on any subsequent purchaser of Airport Property. Within 90 days of a Consent Decree embodying this Agreement taking effect, the City shall cause this Agreement to be recorded in the property records for the County of Los Angeles, California.

Without limiting the express terms of this Agreement, the FAA agrees that the Airport Property shall be released from all covenants, reservations, restrictions, conditions, exceptions and reservations of rights imposed under the IOT and the Quitclaim Deed and the grant assurances imposed in 1994 upon the effectiveness of this Agreement and to provide such notice as required under 49 U.S.C. 847153(c). Upon the City's request, the FAA shall execute, acknowledge and deliver from time to time any instruments reasonably necessary requested by the City appropriate to evidence the release of the Airport Property from all such covenants, reservations, restrictions, conditions, exceptions and reservations of rights. The Parties shall record any instruments necessary to effectuate this provision.

The City's operation of the Airport until December 31, 2028 shall conform with (i) the standards set forth in grant assurances 19, 22, 23, 24, 25, and 30; and (ii) all applicable state and federal operational, maintenance, and safety standards. For purposes of this paragraph, the substantive standards of grant assurances 19, 22, 23, 24, 25, and 30 shall apply until December 31, 2028.

If the City enters into future grant agreements with the FAA, then it shall also be bound by those terms as provided for in any such grant agreement in addition to any applicable the standards expressly set forth in this Agreement.

If the City does not enter into future agreements with the FAA that continue to require the City to operate the Airport after December 31, 2028, the Parties agree that the City may, in its sole discretion at any time on or after January 1, 2029, cease to operate the Airport as an airport and may close the Airport to all aeronautical use forever, subject only to the applicable 30 day notice requirements set forth in 49 U.S.C. § 46319(a) and 14 C.F.R. Part 157.5(b)(2).

## VII.    UNLEADED FUEL

The FAA is committed as a matter of national aviation policy to support the development and use of unleaded aviation gas appropriate to the operation of piston aircraft where commercially and technically feasible. The FAA agrees to consider any demonstration project the City may seek to implement pertaining to the use of unleaded fuel. Nothing in this Agreement shall allow the City to restrict the sale of leaded aviation fuel for as long as the FAA authorizes use of such fuels within the United States.

7

## VIII.  MISCELLANEOUS PROVISIONS

**A.  Enforcement.** The Parties reserve the right to judicially enforce any terms or provisions of this Agreement.

**B.  Consent Decree.** The terms of this Agreement shall be memorialized and embodied in a consent decree to be filed in *City of Santa Monica v. United States of America, et al.,* Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.) in the form attached as Exhibit D.  The court shall have jurisdiction to issue injunctive relief only as to the provisions of sections II, III, and IV.  Further, the court shall have jurisdiction to enforce the provisions of sections II, III and IV as to any successors, transferees, licensees, agents, heirs, and assigns of the City's interests in, operation of, or sponsorship of SMO.  The court shall not have jurisdiction to subject the Parties to penalties or sanctions for any alleged violations of its obligations in this Agreement.

**C.  Own Costs.** Each Party shall bear its own costs, including attorney fees.

**D.  Authority.** The representatives of each Party hereby certify that he or she is duly authorized to enter into the Agreement.  The City represents that it has the full authority to perform all of the acts and obligations it has agreed to perform under the terms of this Agreement. The United States, acting trough the Department of Justice and the FAA represents that the FAA has the full authority to perform all of the acts and obligations it and the United States of America has agreed to perform under the terms of this Agreement.

**E.  Copies and Counterparts.** It is contemplated that this Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together constitute one and the same document. Facsimiles, hard copies, and scanned electronic copies of signatures, including scanned electronic copies sent by email, shall constitute acceptable, binding signatures for purposes of this Agreement.

**F.  Defense of This Agreement.** The Parties agree to vigorously and actively defend this Agreement, any resulting Consent Decree, and all terms embodied therein as fair and reasonable, to vigorously and actively defend the same against any challenge by any individual or entity.  The Parties further agree not to undermine directly or indirectly this Agreement, any resulting Consent Decree or any terms set forth therein for so long as this Agreement or any resulting Consent Decree remains in effect.

**G.  Modification.** This Agreement may be supplemented, amended, or modified only by the mutual agreement of the Parties, and, once the Consent Decree is entered, only with the approval of the court.  No supplement, amendment, or modification of this Agreement shall be binding unless it is in writing and signed by all duly authorized representatives of each Party.

**H. Successors or Assigns.** This Agreement and any resulting consent decree shall be binding upon and inure to the benefit of the Parties and their respective successors, transferees, licensees, agents, heirs, and assigns. Prior to any change of the sponsor of SMO or to the identity of the holder of any operating certificate related to the operation or sponsorship of SMO the City shall obtain the written agreement of such new entity to be bound by the terms of this Agreement and any resulting consent decree.

**I. Precedent.** Nothing in this Agreement shall constitute an admission concerning any allegation, claim, or defense at issue in in *City of Santa Monica v. United States of America, et al.,* Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.), *City of Santa Monica v. Federal Aviation Administration,* No. 16-72827, (9th Cir.), or *in re Compliance with Federal Obligations by the City of Santa Monica,* FAA NO. 16-16-13 (U.S. Dep't of Transp., Fed. Aviation Admin.), and this Agreement has no precedential effect as to any other dispute between the Parties or between either the City or the FAA and any third party. This Agreement is made in light of the unique circumstances of this case and the uncertainty of the specific matters resolved hereby. Nothing herein shall be construed to be an admission of liability or as an interpretation of the validity or terms or provisions of any other instruments or contracts.

**J. Release.** Upon the entry of the Consent Decree, the Parties and all their heirs, administrators, representatives, attorneys, successors, and assigns, hereby release, waive, acquit, and forever discharge each other and all their respective officers, employees, and agents from, and are hereby forever barred and precluded from prosecuting, any and all claims, causes of action, and/or requests for relief asserted in *City of Santa Monica v. United States of America, et al.,* Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.), *City of Santa Monica v. Federal Aviation Administration,* No. 16-72827, (9th Cir.), and *In re Compliance with Federal Obligations by the City of Santa Monica,* FAA NO. 16-16-13 (U.S. Dep't of Transp., Fed. Aviation Admin.), as well as any and all claims, causes of action, and/or requests for relief, whether or not made, against any Party that could have been raised in those matters, with the exception of proceedings to enforce this Agreement or the Consent Decree.

**K. No Third Party Rights.** This Agreement is not intended to create, and does not create, any third party beneficiary, rights, confer upon any non-party a right to enforce or sue for an alleged breach of the Agreement, or generate any other kind of right or privilege for any person, group, or entity, other than the Parties.

**L. Effective Date.** This Agreement shall be effective upon the date the Court enters an order approving this Agreement.

For the Federal Aviation Administration:

_____

Reginald C. Govan
Chief Counsel
Federal Aviation Administration


**For the Department of Justice**

JOYCE BRANDA
Acting Assistant Attorney General

EILEEN M. DECKER
United States Attorney

JUDRY SUBAR
Assistant Branch Director

RAPHAEL O. GOMEZ (D.C. Bar #305540)
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-1318
Facsimile: (202) 616-7460
Raphael.Gomez@usdoj.gov

_____

GARY D. FELDON (D.C. Bar #987142)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-4686
Fax: (202) 616-8470
Email: Gary.D.Feldon@usdoj.gov

Dated: ___1/30/17___

**For the City of Santa Monica:**
**Attest:**

Rick Cole
City Manager

Denise Anderson-Warren
City Clerk

Joseph Lawrence
Interim City Attorney

Dated: 1-30-17

Approved as to form:

William V. O'Connor
Morrison & Foerster LLP
12531 High Bluff Drive | San Diego, CA 92130-2040
P: +1 (858) 720.7932
WOConnor@mofo.com

Dated:

Attorneys for the City of Santa Monica

**IT IS SO ORDERED.**

Signed ___, _____, 2017, at Los Angeles, California

_____

Honorable John F. Walter
United States District Court
For the Central District of California

11

**Acknowledgements:**

District of Columbia
City of Washington

Subscribed, sworn and acknowledged before me by Reginald C. Govan, Chief Counsel of the Federal Aviation Administration, this 27 day of January, 2017.

Notary Public.
My commission expires 10/14/2020

JUDY S. MCGHEE
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires October 14, 2020

State of California
County of _____

On _____ before me, _____ personally

Appeared _____

_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

_____   (Seal)
Signature