LANE DILG (SBN 277220)
City Attorney
Lane.Dilg@smgov.net
IVAN O. CAMPBELL (SBN 216049)
Deputy City Attorney
Ivan.Campbell@smgov.net
1685 Main Street, Third Floor
Santa Monica, California 90401-3295
Tel: 310.458.8336; Fax: 310.393.6727

DAVID M. WALSH (SBN 120761)
DWalsh@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, California 90017-3543
Tel: 213.892.5200; Fax: 213.892.5454

Attorneys for Defendant
CITY OF SANTA MONICA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRY ROSEN, Individually and as a Private Attorney General, <br><br> Petitioner and Plaintiff, <br><br> v. <br><br> UNITED STATES GOVERNMENT, FEDERAL AVIATION ADMINISTRATION, AND CITY OF SANTA MONICA, <br><br> Respondents and Defendants. | Case No. 2:17-cv-07727 PSG (JEMx) <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT CITY OF SANTA MONICA'S MOTION TO DISMISS VERIFIED THIRD AMENDED PETITION** <br><br> Date: July 9, 2018 <br> Time: 1:30 p.m. <br> Hon. Philip S. Gutierrez <br> Courtroom: 6A <br><br> Third Amended Petition Filed: <br> March 19, 2018 |

# **TABLE OF CONTENTS**

Page

I.    BACKGROUND ............................................................................... 1

    A.   The City Leased the Airport to the United States ...................... 1

    B.   The 1984 Settlement Agreement ................................................ 2

    C.   The City Accepts Its Last Federal Grant in 1994 ..................... 3

    D.   The City Evaluates the Future of the Airport ............................ 3

    E.   The City Sues the United States for Quiet Title ........................ 4

    F.   The City Approves a Consent Decree/Settlement Agreement .................. 4

    G.   The Runway Shortening Project Begins ..................................... 6

    H.   *Scott* Petitioners File An Unsuccessful Writ Petition to Enjoin the Runway Shortening Project ........................................................ 6

    I.   Plaintiff Files His Writ Petition to Enjoin the Runway Shortening Project ......................................................................................... 7

II.   THE COURT SHOULD DISMISS PLAINTIFF'S SECOND AMENDED PETITION FOR LACK OF STANDING ............................................. 8

III.  THE COURT SHOULD DISMISS PLAINTIFF'S THIRD AMENDED PETITION FOR FAILURE TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED ...................................................................... 10

    A.   Legal Standard ........................................................................ 11

    B.   Plaintiff's Third Amended Petition Fails to State A Claim .................... 11

        1.   The FTCA's Claims Requirement Never Applied to the Claims in the Quiet Title Action ................................................. 13

        2.   The Consent Decree is Valid Because the City Sued the Proper Party—the United States—in the Quiet Title Action. ....... 14

        3.   The City Did Not Improperly Hire Outside Counsel in the Quiet Title Action ............................................................... 15

4.    City Councilmembers Had No Financial Conflict of Interest Prohibiting Them From Voting On the Consent Decree .............. 16

5.    The FAA Had (and Has) Full Authority to Enter and Perform Under the Consent Decree .............................................. 18

6.    The City Officials who Executed the Consent Decree had the Proper Authority to do so ............................................. 18

7.    The City and the FAA Have Complied with All Applicable Laws and Regulations .................................................. 20

    a.    The City Is Not Subject to the APA .................................... 20

    b.    The City Is Not Subject to NEPA ....................................... 21

    c.    Plaintiff's CEQA Challenge is Time-Barred, and the City is Categorically Exempt from CEQA ......................... 21

    d.    Plaintiff's Claims Regarding Local Municipal Regulations Lack Merit ...................................... 22

IV.   THE THIRD AMENDED PETITION SHOULD BE DISMISSED ON THE ALTERNATIVE GROUND THAT IT IS AN IMPROPER ATTACK ON THE CONSENT DECREE ...................................... 23

V.    CONCLUSION ................................................ 24

## Federal Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................11

*Balistreri v. Pacifica Police Dept.*,
  901 F.2d 696 (9th Cir. 1988) .....................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................11

*Cetacean Cmty. v. Bush*,
  386 F.3d 1169 (9th Cir.2004) .......................................................................8

*Citizens for Balanced Use v. Montana Wilderness Ass'n*,
  647 F.3d 893 (9th Cir. 2011) .....................................................................24

*Fogerty v. Fantasy, Inc.*,
  510 U.S. 517 (1994) ...................................................................................21

*Frew v. Hawkins*,
  540 U.S. 431 (2004) ...................................................................................24

*Glenbrook Homeowners Ass'n v. Tahoe Reg'l Planning Agency*,
  425 F.3d 611 (9th Cir. 2005) .....................................................................21

*In re Bidz.com, Inc. Deriv. Litig.*,
  773 F.Supp.2d 844 (C.D. Cal. 2011) .........................................................11

*In re Coleman*,
  560 F.3d 1000 (9th Cir. 2009) .....................................................................9

*Lake Mohave Boat Owners Ass'n v. Nat'l Park Serv.*,
  78 F.3d 1360 (9th Cir. 1995) .....................................................................21

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*,
  507 U.S. 163 (1993) .............................................................................11, 16

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .....................................................................................9

*Mangini v. R.J. Reynolds Tobacco Co.*,
  793 F.Supp.925 (N.D. Cal. 1992) ..............................................................10

*Marino v. Countrywide Fin. Corp.*,
  26 F.Supp.3d 955 (C.D. Cal. 2014) .........................................................8, 9

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*,
  688 F.2d 615 (9th Cir. 1982) .....................................................................12

*Principal Life Ins. Co. v. Robinson*,
  394 F.3d 665 (9th Cir. 2005) .......................................................................9

*Santa Clarita Org. for Planning & the Env't (SCOPE) v. Abercrombie*,
  192 Cal. Rptr. 3d 469 (Cal. Ct. App. 2015) ..........................................17, 18

*SEC v. Randolph,*
  736 F.2d 525 (9th Cir. 1984) ....................................................................... 24

*Sheridan v. United States,*
  487 U.S. 392 (1988) ..................................................................................... 13

*Texas v. United States,*
  523 U.S. 296 (1998) ..................................................................................... 10

*Toxic Injuries Corp. v. Safety–Kleen Corp.,*
  57 F.Supp.2d 947 (C.D. Cal. 1999) ............................................................ 10

*Turtle Island Restoration Networks v. U.S. Dep't of Commerce,*
  672 F.3d 1160 (9th Cir. 2012) .................................................................... 23

*TYR Sport Inc. v. Warnaco Swimwear Inc.,*
  679 F.Supp.2d 1120  (C.D. Cal. 2009) ...................................................... 20

*United States v. State of Or.,*
  913 F.2d 576 (9th Cir. 1990) ...................................................................... 12

*Wright v. Gregg,*
  685 F.2d 340 (9th Cir. 1982) ...................................................................... 15

**Goverment Code**

§ 54956.9 ............................................................................................................ 5

§ 87100 ....................................................................................................... 16, 17

§ 87103 ............................................................................................................. 17

§ 91003(b) ........................................................................................................ 18

**Public Resources Code**

§ 21167 ............................................................................................................. 22

**Cal. Code of Regulations**

Tit. 2, § 18703(a) ............................................................................................. 17

**United States Code**

28 U.S.C. § 2409a ...................................................................................... 14, 15

28 U.S.C. § 2675 ............................................................................................... 13

28 U.S.C. § 2675(a) .......................................................................................... 13

42 U.S.C. § 4332(2) .......................................................................................... 21

49 U.S.C. § 46319(a) .......................................................................................... 9

5 U.S.C. § 551(1) .............................................................................................. 21

5 U.S.C. § 553 .................................................................................................20

5 U.S.C. § 705 .................................................................................................20

5 U.S.C. § 706 .................................................................................................20

**Santa Monica City Charter**

§ 640.................................................................................................................20

**Santa Monica Municipal Code**

§ 2.24.073(a)-(f) ..............................................................................................16

§ 2.24.073(d) ...................................................................................................16

§ 2.32.030.........................................................................................................19

**Code of Federal Regulations**

14 C.F.R. Part 157.5(b)(2) ................................................................................9

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2      The City of Santa Monica ("City") respectfully submits this motion to dismiss

3   Plaintiff Barry Rosen's "(Verified) Third Amended Petition for Writ of Mandate and

4   Complaint for Declaratory and Injunctive Relief for Violations of Administrative

5   Procedure Act (APA), National Environmental Policy Act (NEPA), California

6   Environmental Quality Act (CEQA), California State Aeronautics Act, et al." (the

7   "Third Amended Petition" or "Petition"). (ECF No. 56) The Court should see this

8   Third Amended Petition for what it is: a frivolous complaint brought woefully late,

9   and one that raises meritless issues substantially similar to those that were

10   categorically rejected by Judge Lew not too long ago. *See Scott v. City Council for the*

11   *City of Santa Monica*, No. 17-CV-07329 RSWL (FFMx), ECF Nos. 43, 56 (the "*Scott*

12   Action"). For the same reasons Judge Lew found for the City in the *Scott* Action, and

13   other reasons described below, the Court should deny the relief Plaintiff requests here

14   and dismiss the Third Amended Petition with prejudice.

15   ## I.   BACKGROUND

16      There is a long and storied history behind the Santa Monica Airport (the

17   "Airport" or "SMO"), the last several decades of which can be described largely as the

18   City's successful battle to gain local control over its Airport. The relevant facts,

19   however, reach further into history and begin nearly one hundred years ago.

20   ### A.   The City Leased the Airport to the United States

21      SMO (originally called Clover Field) first opened for aviation use in 1919. In

22   1926, The City of Santa Monica acquired title to certain parcels of unimproved land

23   that now constitute most of the property that underlies SMO. Between 1926 and 1949,

24   the City acquired additional smaller parcels that make up the rest of the Airport

25   property.

26      In December 1941, to aid in the war effort, the City leased the Airport to the

27   United States for nominal rent. The only two parties to the agreement were the City

28   and the United States. The United States' leasehold at SMO was accomplished

through two separate leases covering two adjoining parcels of land. (Request for Judicial Notice ("RJN") Ex. 1, (Golf Course Lease); RJN Ex. 2, (Runway Lease)) On December 27, 1944, the City and the predecessor to the FAA, the Civil Aeronautics Administration ("CAA"), executed a Form AP-4 Agreement whereby the CAA would improve the landing area and other unidentified areas of SMO at its sole discretion. (RJN Ex. 3, (AP-4 Agreement), at 3) At the end of World War II, the United States determined that it was no longer necessary to maintain a presence at the Airport. Accordingly, the United States and the City amended both leases to reflect the federal government's intention to leave SMO and return it to the City. (RJN Ex. 5, (Supp. No. 2 to Runway Lease); RJN Ex. 4, (Supp. No. 2 to Golf Course Lease)) Under the amendments, the United States stopped operating the Airport and paying rent to the City. (*Id.*)

On July 29, 1946, the United States, acting through the War Assets Administration, declared as surplus the United States' leasehold interests, (RJN Ex. 6, (Form SPB-5 Declaration of Surplus Real Property)), and on August 10, 1948, the United States officially surrendered its leasehold interest in the Airport to the City pursuant to an Instrument of Transfer ("IOT"). (RJN Ex. 7, (Instrument of Transfer)) In 1949, the United States transferred to the City by quitclaim deed 20 acres of Airport land that the United States had acquired through condemnation proceedings during the war. Notably, the City provided the "just compensation" needed to condemn and acquire these 20 acres conveyed in the Quitclaim Deed. (RJN Ex. 8, (1949 Quitclaim Deed)) The land subject to this Quitclaim Deed—added to the land that the City already owned—comprises all of the Airport land.

**B.    The 1984 Settlement Agreement**

In the 1960s, jets began using the Airport, imposing a severe noise impact on adjacent neighborhoods. In response to resident concerns about noise and safety, the City considered closing or substantially limiting operations at SMO. The aviation user community and national aviation associations objected, thereby prompting the FAA to

respond to these concerns in an April 1971 letter to the Senior Vice President of the Aircraft Owners and Pilots Association. The FAA stated that "Santa Monica Airport is vulnerable to being discontinued and its land used for non-airport purposes." (RJN Ex. 9, (1971 FAA Letter))

In June 1981, the City Council adopted Resolution No. 6296, declaring its intention to close SMO as soon as legally possible. (RJN Ex. 10, (Santa Monica City Council Resolution No. 6296)) Thereafter, in 1983, the City adopted a new Master Plan for its Airport property. Resolution No. 6296 and the new Master Plan prompted the initiation of several FAA administrative enforcement actions against the City. As a result, the FAA and the City entered into negotiations concerning SMO's operations, which culminated in the signing of a settlement agreement in 1984 (the "1984 Agreement"). (RJN Ex. 11, (1984 Agreement)) The 1984 Agreement expressly provided that the City was required to operate SMO as an airport only until July 1, 2015. (*Id.*)

## C.   The City Accepts Its Last Federal Grant in 1994

In June 1994, the City accepted its last federal Airport Improvement Program grant in exchange for contractual promises to continue operating the Airport for the useful life of improvements made with the grant funds, but for no more than twenty years from the date of execution of the grant agreement. (RJN Ex. 12, (1994 Grant Agreement Contract No. DTFA08-94-C-20857)) The City's grant assurances required—consistent with the duration of the 1984 Settlement Agreement—that the City continue to operate SMO as an airport until no later than June 29, 2014, twenty years after the City entered into the 1994 Grant Agreement. (*Id.*)

## D.   The City Evaluates the Future of the Airport

In December 2010, in anticipation of the expiration of the 1984 Settlement Agreement, the City Council directed its staff to conduct a comprehensive public process regarding SMO's future. The result was an April 2013 City Council Report on the "Visioning Process." (RJN Ex. 13, (April 30, 2013 City Council Staff Report))

1  The Visioning Process concluded that the status quo at the Airport was not acceptable

2  to residents. (*Id*.)

3        In 2014, a Santa Monica City Council-Referred Question, "Measure LC"

4  (which stands for "Local Control"), was placed on the election ballot for voters in the

5  City of Santa Monica. (RJN Ex. 14, (City Council Resolution 10827) Measure LC

6  would require voter approval for any alternate or new developments on the airport

7  land, except for parks, open space, and recreational areas. (*Id*) Under Measure LC, the

8  governance of the Airport was placed in the hands of the City Council. Santa Monica

9  voters ultimately passed Measure LC, with 15,434 votes in favor, and 10,096 votes

10  against, and thus confirmed the community's desire for the Airport to be subject to

11  local control and that the property be developed consistent with community principles.

12  (RJN Ex. 15, (City Council Resolution 10850))

13        **E.**    **The City Sues the United States for Quiet Title**

14        In October 2013, the City filed a quiet title action against the United States

15  seeking a declaratory judgment that the City has unencumbered title to the Airport

16  property. *City of Santa Monica v. United States*, *et al.*, Civil Action No. 13-CV-08046

17  JFW (VBKx), Dkt. No. 1 ("Quiet Title Action"). In the Quiet Title Action, the City

18  disputed the FAA's claim that the City was obligated to keep the land underlying

19  SMO open as a public airport indefinitely. While the Quiet Title Action was pending,

20  the City was involved in several other disputes related to its ability to exercise local

21  control over Airport operations and, ultimately, clarify the City's right to close the

22  Airport if it so chose. These concurrently pending Airport-related disputes included,

23  among others: (i) *City of Santa Monica v. FAA*, Court of Appeals for the Ninth

24  Circuit, Case No. 16-72827; and (ii) *In re: Compliance with Fed. Obligations by the*

25  *City of Santa Monica*, Federal Aviation Administration Docket No. 16-16-13.

26        **F.**    **The City Approves a Consent Decree/Settlement Agreement**

27        On January 25, 2017, while the Airport-related disputes were pending,

28  including the Quiet Title Action, the City posted an agenda for a Special Meeting of

4

the City Council to be conducted on January 28, 2017. (RJN Ex 16, (Jan. 28 Special Meeting Agenda)) The Special Meeting Agenda included six closed session items for conference with legal counsel regarding pending litigation, as authorized under California Government Code § 54956.9. (*Id* at 3) The Quiet Title Action was listed as Item 1.D. (*Id* at 3)

Three members of the public, but not Plaintiff, made public comments on the closed session items prior to the City Council convening for Closed Session. (RJN Ex. 17, (Jan. 28 Meeting Minutes)) After hearing public comment, the City Council convened to closed session to discuss the litigation items listed on the Agenda. (*Id* at 1)

Upon reconvening into open session, the Interim City Attorney gave a detailed explanation of a proposed consent decree/settlement agreement that the Council had considered in closed session ("Consent Decree"). (*Id*) He explained that the proposed Consent Decree: (i) would resolve as settled all outstanding pending disputes between the City and the federal government, including the Quiet Title Action; (ii) require the City to operate the Airport as an airport only until December 31, 2028; and (iii) give the City the right to shorten the runway to 3,500 feet. (*Id*) The Interim City Attorney also explained that the City Attorney's Office, as well as the City's outside legal counsel, all recommended settlement of the pending Airport-related disputes pursuant to the Consent Decree. (*Id* at 2)

Following the Interim City Attorney's report, the City Council publicly debated the merits of the proposed Consent Decree, moved for a vote, and voted in public 4-3 to approve the proposed Consent Decree. (*Id* at 2-3) The City Council, in compliance with the Brown Act and in full view of the public, approved the Consent Decree and thus settled the Quiet Title Action with the United States. (*Id; Scott* Action, ECF No. 41, Exhs. 2-3).

On January 30, 2017, the City and the federal government executed the proposed Consent Decree. (Petition ¶ 27, Ex. 5; RJN Ex. 18, (Stipulation and

Order/Consent Decree)) The Santa Monica City Manager executed the Consent Decree on behalf of the City pursuant to his authority under the City's Charter and Municipal Code. (*Id* at 16; RJN Ex.19, (City Charter provisions and Ordinances)) Both the City Attorney and City Clerk, pursuant to their obligations under local law, also executed the Consent the Decree on behalf of the City. (*Id*) The City executed the Consent Decree in the only manner provided for under its Charter and Municipal Code.

On February 1, 2017, Judge John F. Walter of this Court accepted and entered the widely publicized Consent Decree and settlement of the Quiet Title Action (Quiet Title Action, Dkt. No. 57; RJN Ex. 18 (Stipulation and Order/Consent Decree))

## G.   The Runway Shortening Project Begins

Immediately following the entry of the Consent Decree by the Court, the City began its public process, including holding public hearings, to effectuate the Consent Decree and determine how to shorten the runway, in accordance with both the Consent Decree and its legal obligations, including those under CEQA.[1] Plaintiff could have appeared and objected during the public hearings but chose not to do so. More importantly, Plaintiff does not allege in his Petition—nor can he—that he attended any of these public hearings.

## H.   *Scott* Petitioners File An Unsuccessful Writ Petition to Enjoin the Runway Shortening Project

On April 28, 2017, the *Scott* Petitioners filed a Verified Petition for Writ of Mandate and Complaint for Injunctive and Declaratory Relief in Los Angeles County Superior Court. (*Scott* Action, Dkt. No. 01-2, *Scott* Petition.) The *Scott* Petitioners challenged the City's compliance with the Brown Act and ultimately sought to delay (or permanently enjoin) the runway shortening project.

---

[1] For a thorough discussion of the City's Consent Decree implementation steps made at public hearings, see *Scott Action*, ECF No. 33 (City's Response to Order to Show Cause re Preliminary Injunction), at 7-8.

**MEM OF P'S & A'S IN SUPPORT OF CITY'S MOTION TO DISMISS THIRD AMENDED COMPLAINT**

The City removed the *Scott* Action to this Court on October 5, 2017. On October 16, 2017, Judge Lew denied the *Scott* Petitioners' motion for a preliminary injunction. (*Scott* Action, ECF No. 56.) Judge Lew concluded that the *Scott* Petitioners failed to meet "the *Winter* test to enjoin [the City] from shortening the Airport runway" because they could not show a likelihood of success on the merits, that the balance of equities favored the City, and that enjoining the runway construction would not further the public interest. (*Id*)

On October 23, 2017, the City began construction on the runway shortening project. (RJN Ex. 20 (City Press Release re project commencement)) The *Scott* case was then re-assigned for resolution of a narrow question related to the Brown Act, after which, on December 15, 2017, this Court dismissed all of the *Scott* Petitioners' outstanding claims with prejudice. (*Scott* Action, ECF No. 73.)

## I.    Plaintiff Files His Writ Petition to Enjoin the Runway Shortening Project

The same day the City began construction on the runway shortening project, Plaintiff filed a "Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief" and an "Emergency *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction" (the "*Ex Parte* Application"). (ECF Nos. 1 (Petition), 5 (*Ex Parte* Application)) Two days later, despite having never received proper notice under L.R. 7-19.1, the City filed an objection in opposition to the *Ex Parte* Application. (ECF No. 11.) The next day, citing the *Scott* Action, this Court denied Plaintiff's "Hail Mary" *Ex Parte* Application because (i) Plaintiff failed to show how he would be irreparably harmed absent the proper noticed-motion procedure; and (ii) Plaintiff was not "without fault in filing . . . at the eleventh hour, when he was on notice of the Consent Decree since January and when other legal challenges to the runway have already been brought." (Order 2:6-16, ECF No. 12.) A few weeks later, on November 15, 2017, Plaintiff filed his first amended Petition (the "First Amended Petition") stating the same claims and causes

1  of action but alleging additional reasons for invalidating the Consent Decree. (First

2  Amended Petition, ECF No. 28.)

3      On December 23, 2017, the City completed construction on the runway

4  shortening project. (RJN Ex. 21, (City's Press Release re completion of project)

5      On January 26, 2018, Plaintiff filed his Second Amended Petition, again stating

6  the same claims and causes of action, but this time alleging new reasons for

7  invalidating the Consent Decree and asking the Court to undo the completed runway

8  shortening project.

9      On March 19, 2018, Plaintiff files this Third Amended Petition that appears to

10  recycle his previous claims and causes of actions, and includes a new claim

11  questioning the City's authority to enter into the Consent Decree, and again asks the

12  Court to order the City to "reverse" the shortened runway at SMO which has been

13  operational for more than four months now.

14      The Court should dismiss this case outright for the sheer absurdity of the relief

15  being sought here. Furthermore, Plaintiff lacks standing to bring his claims and has

16  failed to allege sufficient facts that can support any claim upon which relief can be

17  granted. Both of these reasons are independent grounds upon which to dismiss

18  Plaintiff's Third Amended Petition with prejudice.

19

20  **II.**    **THE COURT SHOULD DISMISS PLAINTIFF'S SECOND AMENDED**

21      **PETITION FOR LACK OF STANDING[2]**

22      Plaintiff bears the burden of proving that this Court has subject matter

23  jurisdiction, including whether an actual case or controversy exists to confer Article

24  III standing. *See Marino v. Countrywide Fin. Corp.*, 26 F.Supp.3d 955, 959 (C.D. Cal.

25  2014) (citing *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir.2004)). To show

26  he has standing, Plaintiff must establish: "(1) injury in fact, (2) causation, and (3)

27

28      [2] The City joins the United States' arguments on standing in its concurrently filed Motion to Dismiss to the extent those arguments are applicable to the City.

redressability." *Id.* at 960 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The injury in fact must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (citing *Lujan*, 504 U.S. at 560). "The requirement that a case or controversy exist under the Declaratory Judgment Act is identical to Article III's constitutional case or controversy requirement." *Id.* (citing *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669–70 (9th Cir. 2005)). In addition, a plaintiff seeking declaratory or injunctive relief must show that the issues underlying the requested relief are ripe for review. *See id.* at 961. Ripeness depends upon "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *In re Coleman*, 560 F.3d 1000, 1005 (9th Cir. 2009) (internal quotations omitted).

Here, Plaintiff fails to allege that he has actually suffered a concrete and particularized injury. Nor does Plaintiff allege that he will imminently suffer such an injury as to any alleged cause of action. Instead, Plaintiff pleads in conclusory fashion using generalized and non-specific allegations in an attempt to establish standing. Plaintiff alleges: 1) he is a licensed pilot; 2) who is a user of the Airport; 3) who owns an aircraft based at the Airport; and 4) who "has been injured and continues to face damages…" (Petition at ¶¶1, 9) And Plaintiff thus concluding that he is an "affected party" and is "beneficially interested." (Petition at ¶¶ 1, 9.) But Article III standing requires much more than a vague pronouncement of being injured. *See Marino* 26 F. Supp. 3d at 959. The Third Amended Petition needs to have specific allegations showing that Plaintiff suffered a concrete and particularized injury and it fails do so. Plaintiff is not entitled to declaratory and injunctive relief based on various causes of action that have no connection to any particular injury suffered by Plaintiff.

Moreover, any claim based on a future injury from a possible closure of the Airport under the Consent Decree is not ripe for review. The Consent Decree authorizes (but does not require) the City to close the Airport after December 31,

2028. (RJN Ex. 18 at 12, (Consent Decree)).[3] Thus, any possible injury to Plaintiff resulting from the Consent Decree's authorization for the City to possibly close the Airport is at least ten years in the future and is thus entirely speculative. *See Marino*, 26 F. Supp. 3d at 960 ("[A] claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

Plaintiff also cannot bring an action against the City as a "private attorney general" to assert generalized grievances on behalf of the public. The private attorney general doctrine does not apply here. *See Toxic Injuries Corp. v. Safety–Kleen Corp.*, 57 F.Supp.2d 947 (C.D. Cal. 1999) (holding that a public benefit corporation did not have standing as a private attorney general because it alleged only generalized injuries as a result of exposure to defendant's chemicals, not that plaintiff or any of its directors suffered individual injuries); *see also Mangini v. R.J. Reynolds Tobacco Co.*, 793 F.Supp.925, 929 (N.D. Cal. 1992) (finding that a state-created statutory right to act as a private attorney general does not confer Article III standing in federal court.) Plaintiff is unable to allege with particularity any injury he suffered individually much less one suffered by the general public.

## III. THE COURT SHOULD DISMISS PLAINTIFF'S THIRD AMENDED PETITION FOR FAILURE TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED

Even if Plaintiff had standing to bring his claims, all of them are legally deficient and cannot be cured by amendment; for this independent reason they must be dismissed with prejudice.

---

[3] "If the City does not enter into future agreements with the FAA that continue to require the City to operate the Airport after December 31, 2028, the Parties agree that **the City may, in its sole discretion at any time on or after January 1, 2029, cease to operate the Airport as an airport and may close the Airport to all aeronautical use forever**, subject only to the applicable 30 day notice requirements set forth in 49 U.S.C. § 46319(a) and 14 C.F.R. Part 157.5(b)(2)" (emphasis added).

### A.   Legal Standard

A court should dismiss a complaint that fails to plead facts establishing a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). "[A] complaint 'that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.'" *In re Bidz.com, Inc. Deriv. Litig.*, 773 F. Supp.2d 844, 850 (C.D. Cal. 2011) (quoting *Iqbal*, 556 U.S. at 678). The Court need not accept as true conclusory allegations, legal characterizations, unreasonable inferences, or unwarranted fact deductions. *See In re Bidz.com*, 773 F. Supp. 2d at 850 (citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993)).

### B.   Plaintiff's Third Amended Petition Fails to State A Claim

Plaintiff's Third Amended Petition, similar to the First Amended and the Second Amended, provides nothing in the way of cogent legal theories or supporting factual allegations that would entitle him to any relief in this matter. Plaintiff argues that (1) the Court lacks jurisdiction because the City failed to present an administrative claim to the Government under the Federal Tort Claims Act ("FTCA"); (2) the Quiet Title Action and Consent Decree are "void *ab initio*" because the City allegedly sued the wrong federal agency, improperly hired outside counsel, and improperly voted on the Consent Decree due to conflicts of interest; (3) City and FAA signatories to the Consent Decree did not have the authority to execute the Consent Decree; and (4) the City and FAA failed to comply with various federal, state, and local laws and regulations related to the runway shortening project. (*See generally* Third Amended Petition, ECF No. 56) Based on these alleged violations, Plaintiff asks this Court to declare the Quiet Title Action and the Consent Decree as "invalid ab initio," to vacate the Consent Decree, to vacate the now-expired 1984 Agreement

(expired in 2015), and to order the City "to reverse the shortening of the runway until such time as all FAA requirements are met by the City of Santa Monica." (Petition ¶¶ 77, 148-169)

Plaintiff's claims are both meritless and frivolous. As a threshold matter, the FTCA does not apply to the non-tort and nonmonetary claims asserted in the Quiet Title Action. The City was seeking injunctive and declaratory relief, not money damages. Therefore the City was not subject to any jurisdictional claim-presentation requirement under the FTCA. As for Plaintiff's multi-prong challenge to the validity of the Consent Decree, it is well settled that the Consent Decree—the product of a court-approved settlement—is "presumptively valid," and Plaintiff bears "a heavy burden of demonstrating that the decree is unreasonable" once "the court is satisfied that the decree was the product of good faith, arms-length negotiations." *United States v. State of Or.*, 913 F.2d 576, 581 (9th Cir. 1990).

This Court should reject Plaintiff's invitation to second-guess Judge Walter, who was "on the firing line" in the Quiet Title Action and was "exposed to the litigants, and their strategies, positions and proofs." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 626 (9th Cir. 1982). Judge Walter's view on the fairness of the Consent Decree is entitled to "great weight." *Id.* ("We are not to substitute our notions of fairness for those of the district judge and the parties to the agreement.").[4]

Furthermore, Plaintiff's novel claims that suggest that the City brought the Quiet Title Action against the wrong federal agency, or that the FAA was not the proper contracting party to execute the 1984 Agreement or the Consent Decree, fail for the simple reason that the World War II Lease Agreements are indisputably between the *United States* and the City. (RJN Ex. 1-2 (Leases)) It is simply irrelevant

---

[4] As this Court is well aware, this Court rejected arguments similar to Plaintiff's in the *Scott* Action only a few months ago. (*Scott* Action, ECF No. 56.) That this Plaintiff is not technically beholden to Judge Lew's or this Court's orders in the *Scott* Action is of no moment. Serial litigation over the same issues is disfavored and should not be condoned.

that the War Asset Administration was slated to effectuate the federal government's decision to terminate the leases; the true (and only) parties to the Lease Agreements are the United States and the City. Similarly, the federal government's decision to delegate its authority to govern the National Airspace System (and airports operating therein) to the FAA is the sole reason that the FAA entered into the 1984 Settlement Agreement and the sole reason that the FAA was a defendant in the Quiet Title Action. Indeed, the United States Department of Justice, in the Consent Decree, explicitly stated that the FAA had authority to enter into it and bind the federal government to its terms. (*See* RJN Ex. 18 at 13 (Consent Decree))

Additionally, Plaintiff has no basis whatsoever for his claims that City councilmembers voted on the Consent Decree with a conflict of interest, or that the City improperly hired outside counsel, or that City officials did not have the authority to execute the Consent Decree.

In short, Plaintiff has failed to state a claim for relief that is plausible on its face. Plaintiff's Third Amended Petition reads like a list of personal grievances that Plaintiff has with the City's decision settle its disputes with the FAA, none of which sound in law or give rise to a valid claim against the City. The Petition should be dismissed with prejudice.

## 1.     The FTCA's Claims Requirement Never Applied to the Claims in the Quiet Title Action

Plaintiff argues that Judge Walter lacked jurisdiction to enter the Consent Decree because the City failed to file a claim with the "appropriate federal agency" six months before suing the federal government, as required by the FTCA. (Petition, ¶¶ 34-39 (citing 28 U.S.C. § 2675)) Plaintiff is mistaken and misunderstands the FTCA. The FTCA's claim presentation requirement applies only to claims against the federal government "for *money damages*" involving a federal employee's act that caused "injury or loss of property or personal injury or death." 28 U.S.C. § 2675(a); *see also Sheridan v. United States*, 487 U.S. 392, 398 (1988) (stating that the FTCA "gives

federal district courts jurisdiction over claims against the United States for money damages"). The fatal flaw with Plaintiff's argument is that the City brought the Quiet Title Action only for *declaratory and injunctive relief*. The Third Amended Petition acknowledges this. (Petition, ¶24) The Quiet Title Action was not about money damages. (*Id*; Quiet Title Action, Dkt. No. 1 (Complaint)) The City filed suit in that case to resolve a dispute over "title to real property in which the United States claims an interest." 28 U.S.C. § 2409a. None of the City's causes of action in that case sounded in tort, and thus did not involve a plea for money damages so as to necessitate the filing of a claim under the FTCA. (*Id*) So the FTCA's claim-presentation requirements posed no jurisdictional bar to the City's pursuit of the Quiet Title Action or the resulting Consent Decree entered therein.

## 2. The Consent Decree is Valid Because the City Sued the Proper Party—the United States—in the Quiet Title Action.

Plaintiff suggests the City should have sued the General Services Administration ("GSA"), the successor to the War Assets Administration ("WAA"), because the 1948 IOT (on which the Quiet Title Action was based) was between the City and the WAA—so only the GSA or "an act of congress," could have granted the City the full relief sought in the Quiet Title Action. (Petition, ¶51) Although this argument suffers from several legal problems, the Court need not engage with it in the first instance because Plaintiff ignores that the Lease Agreement and 1948 IOT are *between the City and the United States*, not the WAA. (*See* RJN Ex. 7, IOT)

*First*, the 1948 IOT was between the City and the United States, not WAA or its successor, GSA. (*Id*.) A federal agency necessarily had to administer the IOT on behalf of the United States, and the federal government chose the WAA to do so. (*Id*.) Accordingly, in 2013 when the City initiated the Quiet Title Action under the federal Quiet Title Act for interpretation of the IOT, the City sued the correct party—the United States. (Quiet Title Action, Dkt. No. 1) The Quiet Title Act *requires* the City

to sue the United States, not one of its subsidiary agencies. *See* 28 U.S.C. § 2409a. In fact, when parties sue federal agencies under the Quiet Title Act, courts construe the action as one against the United States. *See, e.g.*, *Wright v. Gregg*, 685 F.2d 340 (9th Cir. 1982) (action under the Quiet Title Act against director of U.S. Bureau of Land Management in his official capacity was construed as a quiet title action against United States). By suing the United States, the FAA, and Michael P. Huerta—the FAA's administrator—in his official capacity, the City's Quiet Title Action can only be construed as "a quiet title action against the United States." *Id.* at 341. This is all that is required or permitted under the Quiet Title Act.

*Second*, the Quiet Title Action was vigorously defended by the Civil Division of the United States Department of Justice (not the FAA), which is the agency responsible for defending the United States in civil suits concerning the federal government. The DOJ never argued that, and Judge Walter never questioned whether, the City sued the correct defendant in the Quiet Title Action. This was not an oversight by the DOJ or by the Court; rather, it is because there is no question that the United States was the proper defendant.

### 3.    The City Did Not Improperly Hire Outside Counsel in the Quiet Title Action

Plaintiff argues that the City failed to comply with the Santa Monica Municipal Code ("SMMC") because it did not "conduct a competitive search process via requests for proposals or by the express approval by the City Council" when it hired Morrison & Foerster to represent the City in the Quiet Title Action. (Petition, ¶¶ 30-33) On the basis of this alleged defect, Plaintiff asks this Court to strike down the City's contract with Morrison & Foerster and all related work product. (*Id.*) The grounds for this request are ridiculous, much less legally meritless.

The Municipal Code says that the City may hire outside counsel for legal work in conjunction with anticipated litigation "without City Council Approval," as long as the City Attorney's procedure for selecting the outside law firm is consistent with

specified criteria that ensure the best qualified firm handles the work. (RJN Ex. 19, (SMMC § 2.24.073(a)-(f))) Furthermore, "the City Manager is authorized to solicit requests for proposals or qualifications *or to proceed in such other fashion for professional services*, whenever the City Manager determines *in his or her sole discretion* that the best interests of the City would be fully served by proceeding in such a manner," (*id.*, § 2.24.073(d) (emphasis added)). Because the Municipal Code ultimately vests sole discretion in City officials to determine how to acquire professional services (including legal services), Plaintiff fails to articulate a claim on the basis of these cited municipal ordinances. And even if Plaintiff could show that the Municipal Code had not been followed in the hiring of City's legal counsel in the Quiet Title Action, such a defect would not entitle Plaintiff to an order of this Court invalidating the City's contract with its outside legal counsel and "all work product related thereto." (Petition, ¶ 33)

### 4. City Councilmembers Had No Financial Conflict of Interest Prohibiting Them From Voting On the Consent Decree

The Third Amended Petition includes the following wild speculation from Plaintiff: "at least one if not more Santa Monica City Council members who voted to approve the [Consent Decree], were in fact fully prohibited from voting for [sic] to approve the [Consent Decree] as they are affected parties with conflicting interests (including financial) pursuant to the California Political Reform Act" (CPRA). (Petition, ¶ 97) *See* Cal. Govt. Code § 87100 *et seq.* The only fact alleged in support of this allegation is that Santa Monica Mayor Ted Winterer "lives directly upwind from the end of the runway under the normal flight path and would benefit (financially and otherwise) from the closure of the airport." (Petition, ¶ 98)

The Court need not accept as true conclusory allegations, unreasonable inferences, or unwarranted fact deductions. *See In re Bidz.com*, 773 F. Supp. 2d at 850 (citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993)). The federal pleading standard, while minimal, is not

meaningless; it "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *In re Bidz.com*, 773 F. Supp. 2d at 850 (quoting *Iqbal*, 556 U.S. at 678-79). Plaintiff's claim that "at least one if not more" City council members were conflicted out of the vote on the Consent Decree is purely speculative, unreasonable as alleged, and is an unsupported conclusion that should be dismissed with prejudice.

The fact that Mayor Winterer lives "upwind" from the end of the Airport runway—even if it were true—does not constitute a disqualifying conflict of interest under the CPRA. The CPRA prohibits local government officials from influencing a governmental decision in which he "knows or has reason to know he has a financial interest." Cal. Gov't Code § 87100. "A public official has a financial interest in a decision . . . if it is reasonably foreseeable that the decision will have a material financial effect, *distinguishable from its effect on the public generally*, on the official, a member of his or her immediate family." Cal. Gov't Code § 87103 (emphasis added)

Here, Plaintiff's allegations regarding a conflict of interest lack legal merit because any beneficial effects from the decision to shorten the runway on the Mayor's residential property would equally benefit a vast swathe of residential property surrounding the Airport. *See Santa Clarita Org. for Planning & the Env't (SCOPE) v. Abercrombie*, 192 Cal. Rptr. 3d 469, 480 (Cal. Ct. App. 2015) ("A governmental decision's financial effect on a public official's financial interest is indistinguishable from its effect on the public generally if . . . a significant segment of the public is affected and the effect on his or her financial interest is not unique compared to the effect on the significant segment."); *see also* Cal. Code Regs. tit. 2, § 18703(a).

And assuming arguendo that a disqualifying conflict were to exist (it does not), and the Mayor did not recuse himself from the City Council's consideration of the Consent Decree, this Court still "is not required to . . . set the official action aside as void" because state law recognizes the Court's discretion, including "according due weight to any injury that may be suffered by innocent persons relying on the official

action." *Abercrombie*, 192 Cal.Rptr.3d at 480; *see also* Gov't Code § 91003(b). No disqualifying conflict of interest exists as a matter of law, but even if it did, Plaintiff has failed to provide any legally sufficient allegations on which this Court could exercise discretion to void the Consent Decree—especially considering the interests of innocent members of the public who are relying on it. These allegations should also be dismissed with prejudice.

### 5.   The FAA Had (and Has) Full Authority to Enter and Perform Under the Consent Decree

Again alleging no supporting facts whatsoever, Plaintiff argues that the FAA "fully lacked any authority" to enter into the Consent Decree with the City. (Petition ¶ 68) This claim is baseless and is contradicted by the plain terms of the Consent Decree itself. Indeed, when the United States stipulated to have the Consent Decree entered by the Court, it represented to the Court that "[t]he United States, acting through the Department of Justice and the FAA represents that the FAA has the full authority to perform all of the acts and obligations it and the United States of America has agreed to perform under the terms of this Agreement." (*See* RJN Ex. 18 at 13 (Stipulation and Order/Consent Decree)) For Plaintiff to cure this defect, he must allege that the Department of Justice misrepresented its authority to Judge Walter. In any event, the FAA and the Department of Justice have acted within the scope of their authority throughout the Quiet Title Action. Plaintiff's claim to the contrary is wholly meritless and cannot form the basis for the relief he seeks. Indeed, even under the most liberal pleading standard, conclusory statements are not sufficient. *In re Bidz.com*, 773 F. Supp. 2d at 850 (quoting *Iqbal*, 556 U.S. at 678–79)

### 6.   The City Officials who Executed the Consent Decree had the Proper Authority to do so

Not wanting to leave any stone unturned, Plaintiff's next novel challenge to the Consent Decree is his theory that the City's agreement with the FAA is "void ab initio" because "[t]he signatories executing the [Consent] Decree on behalf of the

1  FAA and the City did not have authority to bind the FAA or the City." (Petition, ¶¶

2  78-82) Plaintiff claims that Santa Monica City Charter section 640—where the City

3  Council reserved for itself the authority to permanently close SMO to aviation use

4  without voter approval—required that the Council undertake a separate legislative act

5  authorizing the City Manager to execute the Consent Decree on its behalf. (*See id* at

6  ¶81; *see also* RJN Ex. 19 at 1, (City Charter § 640)) Plaintiff alleges that since the

7  Council did not adopt any resolution or pass any ordinance expressly authorizing the

8  City Manager to execute the Consent Decree, the Manager did so without any

9  authority and the Consent Decree should be voided as a result. (*See id* at ¶¶ 81-82)

10       Plaintiff misunderstands the City's legislative process and thus is wrong as a

11  matter of law. Santa Monica Municipal Code section 2.32.030 ("Execution of

12  Contracts) expressly assigns to the City Manager "the additional duty of executing on

13  behalf of the City *all conveyances, contracts and agreements authorized to be*

14  *executed by the City Council* … pursuant to the provisions of the City Charter…"

15  (RJN Ex. 19 at 5, (S.M.M.C. § 2.32.030)) (emphasis added) There was no need for the

16  Council to adopt a separate resolution authorizing the City Manager to execute the

17  Consent Decree because the Manager already had this authority under City's

18  Municipal Code. (*Id*) To suggest otherwise implies that the City's legislative process

19  should be burdened by an unnecessary procedural step. But the City Council protected

20  against such inefficiencies when it adopted Municipal Code section 2.32.030. (*Id*)

21       Furthermore, the Consent Decree was executed by City officials in the only

22  manner provided for under City law. The City's Charter and Municipal code require

23  that all City contracts, conveyances, and agreements be: 1) executed by the City

24  Manager; 2) approved as to form by the City Attorney; and 3) attested to by the City

25  Clerk. (*Id* at 2-4). And this is precisely the method used by the City to execute the

26  Consent Decree, with the required signatures of all three City officials appearing on

27  the document. (RJN Ex. 18 at 16) There is no other way consistent with local law for

28  the City to have executed the Consent Decree.

The Council's reservation unto itself of the authority to close the Airport in Charter section 640 has been assigned to the City Manager under Municipal Code section 2.32.030 for limited purpose of executing agreements on behalf of the City Council. (*Id*) Agreements such as the Consent Decree full under this grant of authority to the City Manager. The Court should dismiss with prejudice all of Plaintiff's claims in this regard as they are incapable of being cured.

### 7.    The City and the FAA Have Complied with All Applicable Laws and Regulations

Plaintiff's fallback position is that even if the Consent Decree is valid, and even if the City sued to correct agency and the FAA acted within its authority, this Court should still issue an injunction against the City and the FAA, and order Defendants to comply with the Administrative Procedure Act ("APA"), the National Environmental Policy Act ("NEPA"), the California Environmental Quality Act ("CEQA"), and other laws and regulations. However the Third Amended Petition fails to state a cause of action under these theories as well.

For one, there is no stand-alone cause of action for injunctive relief. Injunctive relief is a remedy. Plaintiff cannot plead injunctive relief as an independent cause of action, he must allege facts showing that Plaintiff is entitled to relief under a separate cause of action. *See TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F.Supp.2d 1120, 1143 (C.D. Cal. 2009) ("[A] claim for injunctive relief is not a substantive claim, but merely a remedy which must be supported by a viable substantive theory.") This alone is dispositive. But even if Plaintiff's allegations are construed as substantive causes of action, Plaintiff has failed to show that the City or the FAA breached any statutory or regulatory obligation under the laws cited in the Third Amended Petition.

### a.    The City Is Not Subject to the APA

Plaintiff seeks a judicial declaration that Defendants violated the APA (5 U.S.C. § 553, 705, 706) when they "acted arbitrarily, capriciously, contrary to law, abused their discretion, and failed to follow the required procedure in entering into the

1   Settlement and certain provisions of the 1984 agreement with the City of Santa

2   Monica." (Petition, ¶60) To the extent that the Third Amended Petition alleges that the

3   City violated the APA, these allegations should be disregarded by the Court.[5] The City

4   is not a federal agency and thus is not subject to the APA. *See* 5 U.S.C. § 551(1); *see*

5   *also Lake Mohave Boat Owners Ass'n v. Nat'l Park Serv*., 78 F.3d 1360, 1369 (9th

6   Cir. 1995) ("The APA . . . appl[ies] only to the actions of an authority of the

7   government of the United States . . .")

8                   **b.      The City Is Not Subject to NEPA**

9        Plaintiff next asserts that the City failed "to perform Environmental Studies" as

10  required under NEPA. (Petition, ¶ 72) But, like the APA, NEPA only applies to

11  federal agencies. *See Glenbrook Homeowners Ass'n v. Tahoe Reg'l Planning Agency*,

12  425 F.3d 611, 615 (9th Cir. 2005) ("The NEPA explicitly states that it applies only to

13  agencies of the federal government.") (citing 42 U.S.C. § 4332(2)). Plaintiff's NEPA

14  claim, like his APA claim, is meritless.

15                  **c.      Plaintiff's CEQA Challenge is Time-Barred, and the**

16                  **City is Categorically Exempt from CEQA**

17       Plaintiff further alleges that the City violated CEQA, and by extension the

18  California State Aeronautics Act (CSAA). (Petition ¶¶ 83-96) This claim fatally

19  flawed because it is time barred and also because the City is categorically exempt

20  from CEQA.[6]

21       Here, the City filed a Notice of Exemption Concerning the "Santa Monica

22  Airport Runway Shortening Project" on May 25, 2017. (RJN Ex. 22, (Notice of

23

24       [5] It is unclear to the City whether Plaintiff is alleging that the City violated the APA.
     Regardless, the City denies the allegation as it is not subject to the APA.

25

26       [6] Even if the CEQA allegations could survive this motion to dismiss, they should be stricken.
     It is well settled that if "the statute of limitations . . . would prevent proof of . . . allegations from
     being introduced at trial," because the claim to which they relate would be time-barred, "the
27  [allegations are] properly stricken under Rule 12(f)." *Fantasy, Inc.*, 984 F.2d at 1528–29 (holding
     that allegations were properly stricken because they described events occurring outside the statute of
28  limitations for a particular claim), *overruled on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S.
     517 (1994).

1   Exemption)) Plaintiff had until June 29, 2017— 35 days after the City filed its Notice

2   Exemption—to file a challenge against it. Pub. Res. Code § 21167. Plaintiff never

3   challenged the City's CEQA filing. It is too late to do so now. So, as Judge Lew found

4   in the *Scott* Action, "the determinations of environmental benefits [under Resolution

5   11044] are final." (*Scott* Action, ECF No. 56, at 14:18-22.)

6        Even if Plaintiff's claims were not time barred, they are wholly devoid of merit.

7   As Judge Lew noted, the runway shortening project is "categorically exempt under

8   [CEQA]," and that the option chosen for the runway will "reduce the impact of

9   aircraft exhaust and fumes on surrounding residential neighborhoods." (*Id.* at 14:16-

10  25, 15:1-4.) And, as Judge Lew concluded after reviewing the declaration from the

11  City's aviation safety expert, "a shortened runway will provide safety benefits, such as

12  by introducing 300-foot safety areas, preventing larger and faster aircraft from using

13  the Airport, and reducing overall frequency of take-offs and landings." (*Scott* Action,

14  ECF No. 56 at 13:14-22.) To the extent Plaintiff's Petition alleges that City's CEQA

15  analysis insufficiently addressed the impacts from its runway shortening project,

16  Judge Lew rejected similar "incorrect" arguments about alleged negative

17  environmental impact of runway construction. (*Id.* at 14:16–15:4.)

18       The City has complied with CEQA and thus has satisfied any obligations it may

19  have had under CEQA or under the CSAA. It is far too late for Plaintiff to

20  meaningfully say otherwise.

21              **d.     Plaintiff's Claims Regarding Local Municipal**

22                       **Regulations Lack Merit**

23       Plaintiff's claim that the City "shares co-jurisdiction" over the Airport with the

24  City of Los Angeles is unsupported by any authority and is contrary to easily

25  verifiable facts. (*See* Petition, ¶ 102) Disputes involving the Airport have persisted for

26  decades among the City, its residents, various aviation interests, and the FAA. The

27  City of Los Angeles has never been involved. And for good reason: as Judge Lew

28  pointed out, at all relevant times, the City has owned the property on which the

Airport sits. (*Scott* Action, ECF No. 56, at 13:6-8 (J. Lew, Order) ("Defendant did not acquire any interest in land . . . The construction concerns the Airport land Defendant already owned.")) The Consent Decree, among other things, is a recognition by the federal government of the City's fee title ownership interest in the Airport and the City's local control over all aspects of Airport use and development. (*See* RJN Ex. 18 at 11 (Stipulation and Order/Consent Decree)) The City of Los Angeles has no interest in SMO.

The City has never had to comply with the City of Los Angeles' local regulations as related to the Airport—including any requirement to get a permit before the runway was shortened. The City of Los Angeles does not have the sort of regulatory authority alleged by Plaintiff over the Airport. (Petition ¶¶ 106-108) Plaintiff does not allege the specific Los Angeles Code provision that City supposedly violated because no such provision exists. The City properly exercised its plenary authority over the Airport property when shortening the runway. Consequently, the Court should dismiss Plaintiff's claims with prejudice.

## IV.   THE THIRD AMENDED PETITION SHOULD BE DISMISSED ON THE ALTERNATIVE GROUND THAT IT IS AN IMPROPER ATTACK ON THE CONSENT DECREE

Plaintiff's Third Amended Petition should be dismissed with prejudice for the alternative reason that it is an unfounded and untimely procedural attack on the Consent Decree. The Consent Decree is an independently enforceable order, entered on February 1, 2017. Plaintiff cannot now object to the Consent Decree and ask this Court to effectively sit in appeal and reassess the validity of the Consent Decree. To get the remedy he seeks, Plaintiff would have had to timely intervene to ask the Ninth Circuit to vacate the Consent Decree. *See Turtle Island Restoration Networks v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1165 (9th Cir. 2012) (court of appeals had jurisdiction to review consent decree of appeal of intervenor). If intervention was

denied, Plaintiff could have appealed that denial. *See Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011). But Plaintiff did not pursue these lawful options. *See id.* at 897. He cannot now use an end-run procedural attack to invalidate the Consent Decree that he failed to properly challenge.

If Plaintiff is challenging the settlement agreement between the City and the FAA in isolation (and not the Consent Decree), that too is improper. The settlement agreement had "no force and effect" unless it was entered as a Consent Decree. (RJN Ex. 18 (Stipulation and Order/Consent Decree)) Regardless of the disposition of Plaintiff's claims as they relate to the settlement agreement between Defendants, the Consent Decree itself will remain in place, and the FAA and the City will continue to be bound by its terms because it is an independently enforceable judgment. *See Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Once entered, a consent decree may be enforced."); *SEC v. Randolph*, 736 F.2d 525, 528 (9th Cir. 1984) ("A consent decree is a judgment, has the force of res judicata, and it may be enforced by judicial sanctions")

## V.   CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's Third Amended Petition with prejudice.

Dated: April 23, 2018                  CITY OF SANTA MONICA,
                                       a municipal corporation

                                       By: ___/s/ Ivan O. Campbell___
                                             IVAN O. CAMPBELL
                                             Deputy City Attorney

                                       Attorneys for Defendant
                                       City of Santa Monica